No. 93,646

STATE OF KANSAS, *Appellee*, v. LEONARD C. REID, *Appellant*.

(186 P.3d 713)

496

Opinion filed June 27, 2008.

*Korey A. Kaul,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier,* assistant district attorney, argued the cause, and *Phill Kline,* district attorney, and *Paul J. Morrison,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: A jury convicted Leonard C. Reid of the first-degree premeditated murder of a Texaco store's assistant manager and of aggravated robbery of the business. It acquitted him of three counts of vehicle burglary and two counts of theft which were based upon his actions several hours earlier. Reid received a hard 50 sentence and now appeals his convictions and sentence. Our jurisdiction is under K.S.A. 22-3601(b)(1) (conviction of an off-grid crime).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the trial court commit reversible error in admitting evidence under K.S.A. 60-455 that Reid had been fired from the Texaco store for stealing and in failing to give a limiting instruction? No.

2. Did the trial court err in giving the pattern jury instruction, PIK Crim. 3d 52.20, on eyewitness identification? No.

3. Did the trial court err in denying Reid's motion to sever and in failing to give an accomplice instruction? No.

4. Did the trial court violate Reid's due process and jury trial rights by failing to give instructions on lesser included homicides and robbery? No.

5. Did cumulative error deprive Reid of his right to a fair trial? No.
6. Did the trial court err in finding that Reid killed the victim for monetary gain? No.
7. Is the Kansas hard 50 sentencing scheme unconstitutional? No.

Accordingly, we affirm Reid's convictions and sentence.

## FACTS

On October 23, 2002, Muhammad "Salim" Shahidullah was scheduled to work the first half of the night shift, from 10 p.m. to 3 a.m., at the Texaco Star Mart at 96th and Nall in Overland Park. Salim was worried about working at night, so he asked to wear a regular employee shirt, rather than the white shirt he normally wore as an assistant manager. Only managers and assistant managers wore white shirts. They were also the only employees who knew the combinations to the various safes in the store.

Early in the morning of October 24, Kevin Petree rode his bicycle toward the Texaco. As he approached he heard a sound which, as a veteran, he identified as a gunshot. A few seconds later, Petree saw a man run out the store's door and across the street. While he described the man as having dark brown or black curly, kinky hair, he was unable to identify any other distinguishing characteristics.

Petree smelled burnt gunpowder as he walked into the store. He then saw Salim lying face down on the floor. After quickly determining that Salim had been shot in the back of the head, Petree immediately dialed 911. Records show that his call was made at 2:32 a.m. Salim later died, and the store was later found to be missing $4,300.

For a number of reasons, the police believed that the crimes were probably committed by someone who knew how a Texaco store operated. Besides the cash register, the robber was also able to take money out of the drop/floor safe, the back office safe, and the car wash coin box—places about which customers would not generally know and to which only the manager or assistant manager had access by key or combination. In addition, the robber struck

at a financially rewarding time: just before the manager, Cathy Williams (Cathy), began her shift at 3 a.m. and before she retrieved the entire day's receipts for Brinks' security's collection at 9 a.m.

The police also believed the crimes were committed by a person knowledgeable about this store because the perpetrator was aware that Salim was an assistant manager with access to these money depositories, despite his wearing a regular employee shirt. Furthermore, the video surveillance tape was taken, indicating that the perpetrator not only knew of the surveillance system but also that the VCR recorder was locked in a box in the office to which only management had a key.

Accordingly, the State's prosecution theory was that Reid was the shooter and that his codefendant, Lionel Williams (Williams), was his accomplice. Evidence revealed that Reid had worked as a cashier at the store for about a year and a half before being fired for stealing in April 2002, 6 months prior to the crimes. According to Cathy, Reid was pocketing money instead of putting it in the register. She discovered those thefts partly because of the surveillance cameras. After Reid challenged her accusations, she confronted him with her evidence. Among other things, she took a surveillance tape from the locked box containing the VCR in the office and showed Reid his thefts. She then used the evidence of stealing to support her decision to terminate his employment.

After Reid's firing, he often hung out at the store with the employees and regular customers. According to an employee's testimony, about 1 week before the crimes, Reid grabbed the employee work schedule from behind the counter, reviewed it, then immediately made a phone call to an unknown person in hushed tones.

Although Reid did not testify at trial, approximately 1 week after the crimes he told police in a videotaped interview that he was going to visit his girlfriend's daughter on October 23 and was planning to get his car washed at the store. The car wash was closed because it was too cold. Reid admitted to police that he arrived at the store between 10 p.m. and midnight. He remained there for about an hour, visiting with Salim and a customer who frequented the store. Reid then drove around the rest of the night until heading home around 7 the next morning. He also volunteered to the

police he was aware of the store's videotape surveillance system, or, as he exclaimed, those "fuckin' cameras."

Codefendant Williams testified that sometime after 8 p.m. on October 23, he drove to an apartment complex by the store to meet Reid. Williams got into Reid's car and sold him two $10 bags of marijuana. They smoked some of the marijuana and then, at Reid's suggestion, moved to the Citgo across the street from the Texaco a little after 9 p.m. Police later found cigar butts with DNA from both Williams and Reid in that lot.

According to Williams, in between smokes he broke into three cars parked in the lot. During the 2 hours they sat there, both men made phone calls to their girlfriends on Williams' cell phone. Williams called his girlfriend about 12:45 a.m. Afterward, Reid drove Williams back to his car where Williams transferred the stolen property.

Williams testified that he left Reid to get something to eat and then went to his mother's house. An hour or two later, he left to make another drug sale. He then realized he did not have his phone and went home. Later the same day, Williams was at a friend's house with Reid and complained that he had lost his phone. Reid suggested that Williams look in Reid's car, where Williams found his phone under the driver's seat.

Phone records indicated that no calls were made from Williams' phone between 12:45 a.m. and 2:30 a.m. on October 24. However, several phone calls were made just after 2:32 a.m.—the time Petree called 911. By examining the records, the police determined that the calls were made from the store area. Williams insisted that he knew nothing about those calls and that he had lost his phone by that time. The records showed, however, the numbers dialed immediately after the crimes had been previously called many other times from Williams' phone.

Despite Reid's denial to the police that he was in the area after the shooting, one witness placed him there. Renee Showalter, who lived in a condominium near the store and was a frequent customer, testified that later that morning she saw Reid in his car parked in the lot outside her home. Additionally, while Petree could not identify Reid, he testified that during his call to the 911

dispatcher he saw the brake lights come on in a light-colored car across the street. Codefendant Williams testified that the night of the crimes, Reid was driving a silver Chevy Malibu.

Witnesses' descriptions of an individual actually seen in the store around the time of the crimes also resembled Reid. Marsha Brown testified that she pulled into the store around 2 a.m. After pumping the gas, she then went inside to pay and spent a few minutes looking for a Twix candy bar.

Brown was surprised that the store clerk stayed behind the counter and did not offer to assist her in finding the Twix. As she came to the end of a shelf, she turned around and saw that another person was standing behind the counter with the clerk. She described that individual as an African-American man with "either dreadlocks or real poofy" hair. Brown described the incident as "weird." When she was shown a line-up a week later, however, she was unable to identify Reid, an African-American, as the man behind the counter with Salim.

Brown could not find the Twix, so she left the store and went across the street to buy one at another store. That store's receipt was time-stamped 2:13 a.m. As Brown drove home, she passed the Texaco and noticed a man walking quickly down the street, hunched over as if carrying something inside his coat. She did not stop because she saw a Krispy Kreme truck parked in the store lot and assumed that the truck's driver would notice if something was wrong in the store.

The Krispy Kreme truck driver, Scott Roesler, testified that as he walked into the store a black man and Salim walked inside at the same time. Roesler made his delivery, had Salim sign the invoice for the donuts, and left. Store manager Cathy testified that Salim had filled out every single detail on the donut invoice, which she found odd because he usually just noted the log with "KK," the amount of the invoice, and perhaps the date. Cathy believed that Salim's sudden interest in invoice details indicated that the robbery was occurring while Roesler was still in the store.

When shown a photo line-up a few weeks later, Roesler was unable to identify Reid as the man in the store that morning. How-

ever, he testified that during a live line-up, he was 70 or 80 percent sure that the man was Reid.

Reid was charged with first-degree premeditated murder or, in the alternative, first-degree felony murder; aggravated robbery; three counts of burglary of a vehicle; and two counts of theft of property with a value of less than $500. The jury acquitted him of the burglary and theft charges and convicted him of first-degree premeditated murder and aggravated robbery. Because Williams pled guilty to the burglary and theft charges, he was tried with Reid only on the murder and aggravated robbery charges. He was acquitted.

The trial court found that Reid's offense was committed for the purpose of receiving money or obtaining something of monetary value. Accordingly, it gave Reid a hard 50 sentence.

Other facts will be added as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court did not commit reversible error in admitting evidence that Reid had been fired for stealing and in failing to give a limiting instruction.*

Reid argues that the trial court erred in overruling his objection and admitting Cathy's testimony that he had been fired for stealing from the store. He claims that the testimony was not admissible on the basis given by the trial court, *i.e.*, to prove motive under K.S.A. 60-455. Reid also claims that the trial court erred in failing to give a limiting instruction informing the jury of the specific purpose for admission of such evidence.

Two years ago this court modified its approach to analyzing evidence under K.S.A. 60-455 in *State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006). The *Gunby* court began with the threshold consideration of relevance:

"Generally, when considering a challenge to a district judge's admission of evidence, an appellate court must first consider relevance. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference

or result they are intended to establish. *State v. Lumley*, 266 Kan. 939, 950-51, 976 P.2d 486 (1999)." 282 Kan. at 47.

*Gunby* further explained that after relevance, our possible standards of review were then dependent upon the contours of the evidentiary rule in question:

"'*Once relevance is established,* evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted.] When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.'" (Emphasis added.) 282 Kan. at 47-48.

The statute under which Cathy's testimony about Reid's employment termination for stealing was admitted, K.S.A. 60-455, states in part:

"Subject to K.S.A. 60-447 evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove his or her disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion but, subject to K.S.A. 60-445 and 60-448 such evidence [that a person committed a crime or civil wrong on a specified occasion] is admissible when relevant to prove some other material fact including *motive*, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." (Emphasis added.) K.S.A. 60-455.

*Gunby* also clarified that the K.S.A. 60-455 analysis requires several steps. As mentioned, the court must determine that the evidence is relevant to prove a material fact, *e.g.*, motive, knowledge, and identity. The court must also determine that the material fact is disputed. Additionally, the court must determine that the probative value of the evidence outweighs the potential for producing undue prejudice. Finally, the court must give a limiting instruction informing the jury of the specific purpose for admission whenever 60-455 evidence comes in. *State v. Garcia*, 285 Kan. 1, 12, 169 P.3d 1069 (2007) (citing *Gunby*, 282 Kan. at 48, 56-57). As we explained in *Gunby*: "These safeguards are designed to eliminate the danger that the evidence will be considered to prove the defendant's mere propensity to commit the charged crime." 282 Kan. at 48.

*Relevance, probativeness, and materiality*

Reid first argues that the evidence of his firing for stealing was not relevant to prove motive. We have held that motive is the moving power that impels one to action for a definite result. *State v. Jordan,* 250 Kan. 180, 190, 825 P.2d 157 (1992). As we stated in *State v. Engelhardt,* 280 Kan. 113, 128, 119 P.3d 1148 (2005): "Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case."

While *Gunby* established that evidentiary rules may be applied either as a matter of law or in the exercise of the trial court's discretion, depending on the contours of the rule in question, this particular determination only occurs "[o]nce relevance is established." 282 Kan. at 47. *Gunby* did not establish our standard of review for analyzing relevance of certain K.S.A. 60-455 evidence.

We begin our analysis of this question with a short review. As mentioned, the legislature has defined "relevant evidence" as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). This statutory definition bears some resemblance to one found in Federal Rule of Evidence 401: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Several treatises have recognized that the federal rule contains both a probative, *i.e.*, relevancy, element and a materiality element.

"At common law, a distinction was drawn between relevancy and materiality. Relevancy meant that evidence had probative value in establishing a particular point, and materiality meant the point had legal significance in the case. For example, in a products liability action for injuries caused by a power mower, evidence that plaintiff was mowing wet grass in bare feet would be *relevant* on the issue of whether plaintiff was negligent, but such issue would be *immaterial* if the actual cause of the injuries was the blade flying off the mower.

"Under FRE 401, 'materiality' is merged into the definition of relevancy by the requirement that the fact proved must be 'of consequence to the determination of the action.' Therefore, an objection on grounds of irrelevancy now encompasses an objection on grounds of immateriality, and a separate immateriality objection

is no longer required or appropriate. Determining whether evidence is 'consequential' depends on the applicable substantive law." (Emphasis added.) Mueller & Kirkpatrick, Evidence Practice Under the Rules § 4.2, pp. 228-29 (2d ed. 1999).

See also 1 Federal Rules of Evidence Manual, § 401.02[2] (9th ed. 2006) ("Both traditional requirements of relevance analysis—that evidence must relate to issues that are properly in dispute and that it must shed some light on those issues—are combined into one rule. Whether an issue is properly in dispute is, of course, determined by the applicable substantive law.").

The same merger of elements can be found in the Kansas counterpart, K.S.A. 60-401(b): "[E]vidence having any tendency in reason to prove" suggests the probative element, while "any material fact" suggests the materiality element.

K.S.A. 60-455 itself recognizes both elements. The statute provides that the evidence of the prior crime or civil wrong "is admissible when *relevant* to prove [*i.e.*, probative] some other *material* fact including motive." In general, to be material the fact proved must " 'be significant under the substantive law of the case and properly at issue.' " *State v. Goodson*, 281 Kan. 913, 922, 135 P.3d 1116 (2006) (quoting *State v. Faulkner*, 220 Kan. 153, 156, 551 P.2d 1247 [1976]); see *Garcia*, 285 Kan. at 14 (Materiality, for purposes of K.S.A. 60-455, contemplates "a fact which has a legitimate and effective bearing on the decision of the case and is in dispute.").

We have stated that materiality is largely a question of law. *Faulkner*, 220 Kan. at 155. Accordingly, even when a standard of review has been labeled as one for abuse of discretion, a review of the materiality element would most appropriately be de novo. See, *e.g.*, *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 456, 14 P.3d 1170 (2000) ("Questions of law are presented when an appellate court seeks to review the factors and considerations forming a district court's discretionary decision."). See also *Gunby*, 282 Kan. at 47-48 ("When the adequacy of the *legal* basis of a district judge's decision on admission or exclusion of evidence is questioned, we review the decision de novo.").

We observe, for example, that the Second Circuit reviews evidentiary rulings for abuse of discretion. However, in a recent civil

rights case, it held that lost wages were not an issue "and thus legally could not 'affect the outcome of the suit under the governing law.' " *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007). It therefore held: "[T]he district court admitted evidence about the arbitration solely because it was probative of a non-material issue; why Arlio was *not* seeking back wages in the federal action. Thus, the testimony was not relevant and should have been excluded." 474 F.3d at 53. See also *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 633 (8th Cir. 2007) (Utilizing an abuse of discretion standard of review, held Jeep-retrofit evidence "not relevant" to prove feasibility because feasibility was not an issue at trial due to Chrysler's concession); *Richardson v. Missouri Pacific Railroad Co.*, 186 F.3d 1273, 1277 (10th Cir. 1999) (utilizing an abuse of discretion standard of review, held that while defendant argued that evidence of plaintiff's prior lawsuit and settlement was relevant to its defense of release and accord and satisfaction, this defense had no application to the issues; fact that defendant discharged the 1986 injury obligation "simply is not relevant" to the question of whether plaintiff is entitled to recover from defendant for the 1996 incident); *Phillips v. Western Co. of North America*, 953 F.2d 923, 930 (5th Cir. 1992) ("[I]f the substantive law disallows a setoff from the tortfeasor's damages for the plaintiff's collateral benefits, evidence of collateral benefits simply has no relevance in the lawsuit.").

These federal cases' results and specific rationale under federal rules of evidence are essentially contained in similar Kansas case law. In *State v. Carter*, 270 Kan. 426, 442, 14 P.3d 1138 (2000), we reviewed our decision in *State v. Donesay*, 265 Kan. 60, 959 P.2d 862 (1998), in which the *Donesay* court reversed a jury conviction of premeditated murder and a hard 40 sentence because of the improper allowance of the testimony of the widow of the victim. As we stated in *Carter*:

"With regard to the materiality of the widow's testimony, the [*Donesay*] court observed:

'The purpose of the State's eliciting Mrs. Easter's testimony was not to identify the defendant as the killer, was not to show that he intended to kill Officer Easter, and was not to show premeditation. Her testimony was not intended to show the guilt of the defendant, and it did not. We can only conclude that it was intended

to infuriate and inflame the jury against the defendant.' 265 Kan at 89." 270 Kan. at 442.

The *Donesay* court held the admission of this evidence was "patently improper and reversible error." 265 Kan. 60, Syl. ¶ 9. In short, the evidence was immaterial because it was not significant under the substantive law of the case.

In addressing a quite similar situation, the *Carter* court held that certain testimony of the murder victim's father was "immaterial and served only to inflame the jury against the defendant." 270 Kan. at 442. See also *Hayden v. Jack Cooper Transport Co.*, 134 Kan. 172, 5 P.2d 837 (1931) ("Parts of this testimony had no bearing on the controversy of the parties and should have been excluded upon the ground of immateriality.").

Several examples of per se "material facts" are provided for in K.S.A. 60-455, *e.g.*, motive, intent, and knowledge. Consequently, in the instant case the only materiality determination for the trial court to make would have been to see if motive or knowledge were material under the substantive law of first-degree murder or aggravated robbery. They clearly were material. See, *e.g.*, *Englehardt*, 280 Kan. at 128 (Motive often "is a prominent feature of the State's theory of its case."). Indeed, Reid does not complain of lack of materiality. Contrast *Garcia*, 285 Kan. at 14 (Defendant argued that intent and identity were not disputed material facts; if they were, the evidence of his prior convictions were not relevant to prove those material facts.). Reid simply complains that the evidence of his firing for stealing was not relevant to—more specifically, not probative of—motive.

As mentioned, *Gunby* did not establish our standard of review for analyzing relevance—in particular, the probative element—of certain 60-455 evidence. Nevertheless, for several reasons we conclude that the appropriate standard is abuse of discretion. First, the language of K.S.A. 60-401(b) itself suggests a low standard: "evidence having *any tendency in reason* to prove any material fact." (Emphasis added.)

Second, generally applying an abuse of discretion standard to any relevance determination is suggested by legal authorities and

Kansas case law. For example: "In ruling upon relevancy, the [trial] court must draw on its own experience, knowledge, and common sense in assessing whether a logical relationship exists between proffered evidence and the fact to be proven." Mueller & Kirkpatrick, Evidence Practice Under the Rules § 4.1, p. 226 (2008) (citing Thayer, A Preliminary Treatise on Evidence at the Common Law, 265 [1898]: "The law furnishes no test of relevancy."); *Cf. Goodson*, 281 Kan. at 922 ("Because relevancy is a matter of logic and experience, the determination of relevancy is generally seen as inherently discretionary."); *Faulkner*, 220 Kan. at 155 ("Relevancy is more a matter of logic and experience than of law. . . . Materiality, on the other hand, is largely a question of law."); *State v. Baker*, 219 Kan. 854, 858, 549 P.2d 911 (1976) (" '[R]elevancy [is] a matter of logic and experience and not of law. . . . If an item of evidence tends to prove or disprove a proposition, it is relevant to that proposition.' ") (quoting Slough, Relevancy Unraveled, 5 Kan. L. Rev. 1 [1956]).

Finally, applying an abuse of discretion standard for reviewing the probative element determination under K.S.A. 60-455 is also supported by numerous decisions of this court. In *State v. O'Neal*, 204 Kan. 226, 230-31, 461 P.2d 801 (1969), this court noted that 60-455 allows the admission of evidence "when it is relevant to prove certain material facts bearing upon proof of certain elements of the crime, such as motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." We then held that "[t]he determination of relevancy is a matter left to the judicial discretion of the trial judge. However, exercise of that discretion must not be abused. It must be based upon some knowledge of the facts, circumstances or nature of the prior offense." 204 Kan. at 231.

The *O'Neal* court concluded that the defendant's prior conviction for felonious assault should not have been admitted into evidence. Among other things, we stated: "There may or may not have been similarities in the facts of that case [prior felonious assault] which would be relevant to prove [the material facts of] intent or absence of mistake in the present case." 204 Kan. at 231. See *State v. Donnelson*, 219 Kan. 772, 776, 549 P.2d 964 (1976) ("While the

determination of relevancy is a matter left to the judicial discretion of the trial judge, such discretion cannot be abused and must be based upon some knowledge of the facts surrounding the prior offense."); *State v. Moore*, 218 Kan. 450, 454, 543 P.2d 923 (1975) (In a 60-455 case, "the determination of relevancy is a matter left to the judicial discretion of the trial judge."); *State v. Cross*, 216 Kan. 511, Syl. ¶ 7, 532 P.2d 1357 (1975) ("In determining the relevancy of a prior conviction under K.S.A. 60-455 the matter is left largely to the judicial discretion of the trial judge."); *State v. Clingerman*, 213 Kan. 525, 527-28, 516 P.2d 1022 (1973) (The trial court abused its discretion because "it does not appear that the facts of the prior crime were pertinent to prove [60-455 factors] with respect to the present charge.").

Based upon these authorities, we conclude that probativeness determinations of evidence under K.S.A. 60-455 are best reviewed under an abuse of discretion standard. As with our conclusion that materiality determinations under 60-455 are reviewed de novo, any contrary language in our prior decisions is disapproved, and any confusing language is clarified. Obviously, if either the probative or materiality element's standard is not met, then the evidence is inadmissible. If both standards are met, then the appellate court proceeds to the next step(s) in the 60-455 analysis established in *Gunby*.

Having established our standard of review, our analysis of the instant case proceeds with the trial judge's relevancy—more particularly, probativeness—rationale for admission of the "firing-for-theft" evidence:

"His employment at Texaco does have a part of this case. It's intrinsically intertwined in it. The business of removal of the tape and so on, we heard testimony of at the preliminary hearing ties into that. *Now I understand that the defense is objecting to the references to his being terminated for illegal activity. That really goes to motive as well. You got to pick some place if you're going to rob a store, and it* [the termination for theft] *goes to motive with respect to that.* So I think it's clearly admissible evidence." (Emphasis added.)

While perhaps thin, this evidence is nevertheless adequate under an abuse of discretion standard to satisfy the probative element of K.S.A. 60-401(b). As the trial court implies, when an employee is

terminated for theft of an employer's money, retaliation can serve as an incentive to commit a later act. While retaliation may take many forms, there is presumably more satisfaction, and obviously a certain symmetry, in later taking a lot more of the employer's money in a robbery. Accordingly, if one desires to rob any store for thousands of dollars, intertwined with that decision may be the "payback incentive" to choose one particular convenience store out of the numerous ones in the Kansas City metropolitan area. In short, Reid's firing for theft helps comprise the "moving power that impels one to action for a *definite result*." (Emphasis added.) *Jordan,* 250 Kan. at 181.

Even if the theft evidence were without "any tendency in reason" to prove motive, we agree with the State that it certainly had such a tendency to prove knowledge under K.S.A. 60-455. At oral arguments, Reid's counsel essentially asserted for the first time that because the trial court relied only upon the statutorily designated material fact of motive, our review was restricted to that issue. He cited no authority for this proposition.

While "knowledge" was not given as the reason for the trial court's admission of the employment termination evidence, that court's conclusion can be upheld on review even though its given reason may have been wrong. In *State v. Cooperwood,* 282 Kan. 572, 580, 147 P.3d 125 (2006), while the trial court excluded expert witness testimony solely on the basis of relevance, this court instead excluded it on the basis of lack of necessity. We held: "[T]he exclusion can be upheld under the rationale and holding of *State v. Bryant,* 272 Kan. 1204, 1210, 38 P.3d 661 (2002): '[T]he trial court will not be reversed if it is right, albeit for the wrong reason.'" 282 Kan. at 580. In *Bryant,* this court held that although the trial court was wrong to admit the evidence under the res gestae exception, it was nonetheless admissible under the excited utterance exception. 272 Kan. at 1210 (citing *State v. Jones,* 267 Kan. 627, 634, 984 P.2d 132 [1999]).

Particularly given the *Gunby* court's "statutory plain language" expansion of the facts that a court may consider under K.S.A. 60-455 beyond the eight listed in the statute, we see no valid reason why the rationale and holdings expressed by this court in cases

involving other types of evidence cannot apply to 60-455 scenarios. Any contrary language in our prior decisions is disapproved, and any confusing language is clarified. See, *e.g.*, *State v. Marquez*, 222 Kan. 441, 447-48, 565 P.2d 245 (1977); *State v. McCorgary*, 224 Kan. 677, 686, 585 P.2d 1024 (1978) ("The erroneous admission of evidence of a crime under one exception in K.S.A. 60-455 is not made harmless merely by the fact it would have been admissible under another exception not instructed on. [Citation omitted.] Therefore, the court must examine the whole record to see whether the admission of the evidence was harmless or prejudicial under the harmless error rule."); *State v. Castillo*, 34 Kan. App. 2d 169, 171, 115 P.3d 787, *rev. denied* 280 Kan. 985 (2005) ("*McCorgary* did not say that an appellate court cannot consider whether another 60-455 exception might apply, but rather the holding is that the applicability of another exception does not always render harmless the erroneous admission upon an inapplicable exception.").

When viewed through 60-455's "knowledge" lens, the evidence in the instant case reveals that the store crimes were most likely committed by someone with intimate knowledge of the store operations. As a former employee, Reid knew that only management personnel had keys to the various safes and lockboxes. For the same reason, he also knew that Salim was an assistant manager with such access, despite Salim's efforts to disguise his position by wearing a regular employee shirt. Reid also knew the four locations of the money and a good time to rob the store—just before 3 a.m. when Cathy, the manager, came on duty and before she would be gathering the entire day's receipts and cash for collection. He also knew where and how to access the work schedule after his firing, presumably to learn who was working at what times in order to help determine the best opportunity for committing the aggravated robbery and murder.

In addition, Reid admitted to the police that he knew about the store's cameras. Most important, he knew about the existence, and exact location, of the cameras' surveillance tapes. He apparently was not aware of how the security system operated prior to being fired because he denied the thefts until Cathy played him the tape

memorializing them. She testified that she kept the tape-producing VCR in a lockbox in the office. Reid therefore would be one of very few people who knew of the VCR, the lockbox, their location, and the fact that only management, *e.g.*, Salim, the night of his murder, had access. Accordingly, the firing for theft had a tendency in reason to prove Reid had unique knowledge of the store's procedures and safeguards and would be correctly admitted into evidence on this basis.

### Prejudice v. probative value

Based upon the multi-step analytical approach established in *Gunby*, Reid next claims that even if the firing-for-theft testimony was probative, it was erroneously admitted because it was unduly prejudicial. See *Gunby*, 282 Kan. at 48-49.

This part of the evidentiary analysis is also reviewed for abuse of discretion. *Garcia*, 285 Kan. at 18 (citing *State v. Meeks*, 277 Kan. 609, 618, 88 P.3d 789 [2004]). The burden of proof is on the party alleging that the discretion is abused. *Garcia*, 285 Kan. at 18-19 (citing *Meeks*, 277 Kan. at 618).

As noted, the testimony that Reid had been fired for stealing, and the circumstances surrounding his termination, was certainly probative to establish motive and knowledge. It was key to establishing that he was one of the few people who knew of the videotape surveillance system and that the tapes were in a VCR locked in a box in the office to which only management, *i.e.*, Salim, had access. Because of his termination due to a prior videotape from those cameras evidencing criminal activity, the testimony is especially key to establishing that he knew the new incriminating tape had to be removed to destroy evidence of his present criminal activity.

Of great importance to the prejudice analysis is Reid's acquittal of the other honesty-based crimes—burglary and theft from the vehicles across the street earlier that same night. Based upon the acquittal, the jury apparently did not view his theft-based firing as prejudicial propensity evidence. Accordingly, Reid has not shown that the trial court abused its discretion in admitting the testimony.

*Limiting Instruction*

Finally, Reid claims that the trial court erred in failing to give a limiting instruction informing the jury of the specific purpose for admission of the termination evidence.

As noted, *Gunby* also requires the giving of a limiting instruction when 60-455 evidence is admitted. *Gunby*, 282 Kan. at 48, 56-57. Because Reid did not ask for such an instruction, this question is reviewed for clear error. K.S.A. 22-3414(3); *Gunby*, 282 Kan. at 58. Instructions are clearly erroneous if the appellate court finds " ' "there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." ' " *Cooperwood*, 282 Kan. at 581.

To determine whether there is a real possibility the jury would have rendered a different verdict if a limiting instruction had been given, we begin with the obvious. Because the jury acquitted Reid of the other honesty-based crimes, burglary and theft from the vehicles across the street the same night, it apparently did not view his theft-based firing evidence as demonstrating a "propensity to steal" or that he was an otherwise bad person. As a result, even without receiving a limiting instruction, the jury clearly and correctly considered the termination evidence for what it was, *i.e.*, simply evidence of motive and knowledge.

Besides the evidence of the theft-based firing, and the attendant facts of Reid's unique knowledge of the videotapes and where they were locked up, there was significant other evidence presented against Reid. As indicated earlier, his prior employment at this particular store provided him special knowledge on various money locations. He was also able to utilize his employee knowledge of the powers of management, of money collection times and procedures, and of work rosters to determine the optimal date and time to rob.

Reid also admitted to the police that he had been in the store the night of the crimes. Two eyewitnesses, Brown and Roesler, reported seeing an African-American male in the store with Salim around the time Salim was killed. Moreover, Reid was unable to explain his whereabouts at the time of the crimes—just that he was driving around.

During a live line-up, Roesler said he was 70 or 80 percent positive the black man who walked in the store with Salim was Reid. Because of the way Salim filled out the donut invoice, Cathy believed that a lengthy robbery was in process during that time. Reid drove a silver car, and a light-colored vehicle was seen by Petree leaving the scene shortly after the shooting. Though Reid denied being in the area after the robbery, Showalter testified that she saw Reid in a vehicle across the street.

Under these facts, we cannot say there is a real possibility the jury would have rendered a different verdict if the purported trial error, *i.e.*, the lack of limiting instruction, had not occurred. See *Cooperwood*, 282 Kan. at 581. Accordingly, the trial court's failure to give a limiting instruction was not clear error.

Issue 2: *The trial court did not err in giving the pattern jury instruction on eyewitness identification.*

Reid next argues that the trial court erred in giving the jury instruction on eyewitness identification testimony provided in PIK Crim. 3d 52.20. He specifically argues that the instruction was improperly given because the seven factors listed there are not the same as those adopted by this court in *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 (2003).

Because Reid did not object to this instruction at the trial court, he asserts that this court should only review the claim if we find that reaching it is "necessary to serve the ends of justice or to prevent the denial of fundamental rights," citing *State v. Trammell*, 278 Kan. 265, 274, 92 P.3d 1101 (2004). We acknowledge Reid has correctly quoted *Trammell*, which also concerned a defendant's failure to raise an issue regarding the use of PIK Crim. 3d 52.20 until his appeal. 278 Kan. at 269. The proper standard of our review, however, is whether failing to object to the instruction was "clearly erroneous." See K.S.A. 22-3414(3). As mentioned, instructions are clearly erroneous if the appellate court finds " ' "there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." ' " *Cooperwood*, 282 Kan. at 581.

Some background is needed for a full understanding of Reid's argument. In *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972), the United States Supreme Court reviewed the admissibility of eyewitness testimony. In allowing such testimony, the Court identified five factors to consider in the "totality of the circumstances." 409 U.S. at 199. The following factors were to be used in evaluating the likelihood of misidentification:

1. the opportunity of the witness to view the criminal at the time of the crime,

2. the witness' degree of attention,

3. the accuracy of the witness' prior description of the criminal,

4. the level of certainty demonstrated by the witness at the confrontation, and

5. the length of time between the crime and the confrontation. 409 U.S. at 199-200.

In *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981), this court acknowledged that in testing the reliability of identification testimony, the five factors mentioned in *Biggers* should be considered by the trial court in its admissibility determination. It then applied the *Biggers* rationale to instructing the jury on weighing credibility of eyewitness identification testimony:

"*If these five factors should be considered in determining the admissibility of the testimony, it would seem even more appropriate to require the jury to consider the same factors in weighing the credibility of the eyewitness identification testimony.* Otherwise the jury might reasonably conclude that the admission of the evidence by the trial court vouched for its reliability. We think it clear that, in order to prevent potential injustice, some standards must be provided the jury so that the credibility of eyewitness identification testimony can be intelligently and fairly weighed." (Emphasis added.) 230 Kan. at 397.

As a direct result of *Warren*, PIK Crim. 3d 52.20 was promulgated. See *State v. Mann*, 274 Kan. 670, 677-78, 56 P.3d 212 (2002). It instructs the jury on the credibility of eyewitness identification testimony in slightly different ways than *Biggers'* identification of the five factors for the court to consider on the issue of admissibility of eyewitness testimony. See *State v. McIntyre*, 259 Kan. 488, 493-94, 912 P.2d 156 (1996). The pattern instruction states:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he) (she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you *may* consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused;

"7. Whether there are other circumstances that may have affected the accuracy of the eyewitness identification." (Emphasis added.) PIK Crim. 3d 52.20.

In *State v. Hunt*, 275 Kan. 811, this court accepted the Utah Supreme Court's approach in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), which uses "slightly different factors to evaluate the reliability of the identification." 275 Kan. at 817. The *Ramirez* court identified the following factors:

"(1) the opportunity of the witness to view the actor during the event; (2) the witness' degree of attention to the actor at the time of the event; (3) the witness' capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness' identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly. This last factor requires the consideration of whether the event was an ordinary one in the mind of the observer during the time it was observed and whether the race of the actor was the same as the race of the observer." 817 P.2d at 781.

This court in *Hunt* adopted the rationale used by the Utah Supreme Court in *Ramirez*, stating:

"Though three of the [*Ramirez*] factors differ somewhat from the *Biggers* factors, they present an approach to the identification issue which heightens, in our view, the reliability of such identification.

"We accept the *Ramirez* model; however, our acceptance should not be considered as a rejection of the *Biggers* model but, rather, as a refinement in the analysis.

. . . .

"We conclude that the *Ramirez* factors should be adopted as the model for examining such issues and that when requested or where such identification is a central issue in a case, a cautionary instruction regarding eyewitness identification should be given." 275 Kan. at 818.

The issue in *Hunt,* however, was not the propriety of the jury instruction, but rather the factors the trial court would use in determining the admissibility of the evidence, *i.e.*, as in *Biggers.* See *Hunt*, 275 Kan. at 821 (trial court did not err in admitting the identification testimony of store clerk). One year after *Hunt*, in *State v. Trammell*, 278 Kan. at 270-71, we combined the lists, eliminated the two duplications, and recited the eight *"Hunt* factors" for analyzing whether an eyewitness identification should be excluded from evidence.

The *Trammell* court also addressed defendant's jury instruction issue upon which Reid relies. Trammell argued that the trial court erroneously instructed his jury regarding eyewitness identification, relying upon *Hunt* "for the proposition that PIK Crim. 3d 52.20 incorrectly states the law in Kansas." 278 Kan. 269. The *Trammell* court first pointed out that *Hunt* involved guidance for a trial court's evaluation of the reliability of an identification for admission or exclusion from evidence, *i.e.*, not jury instructions. This court next pointed out that Trammell's argument was flawed because

"[i]n *Hunt*, this court did not discard the prior analysis under *Biggers*. Instead, we enhanced the reliability analysis by adding the *Ramirez* factors to the *Biggers* factors, stating: 'We accept the *Ramirez* model; however, our acceptance should not be considered as a rejection of the *Biggers* model but, rather, as a refinement in the analysis.' " *Trammell*, 278 Kan. at 270.

We then elaborated upon our rejection of Trammell's argument:

"Although *Hunt* suggested that a cautionary instruction be given for eyewitness identification, it did not address the validity of PIK Crim. 3d 52.20. [Citation omitted.] Accordingly, *Hunt* does not support Trammell's claim that PIK Crim. 3d 52.20 is erroneous." 278 Kan. at 270.

Just as the *Trammell* court held that *Hunt* did not support Trammell's claim, we hold that *Trammell* does not support the State's present claim that *Trammell* controls and rejects Reid's specific argument. That question was simply left unanswered in *Trammell*.

Reid particularly asserts that *Trammell* "overstates the continued viability of the *Biggers* factors after *Hunt*." He chiefly complains that factor No. 6 of the pattern instruction—the degree of certainty—should not have been presented to his jury. According to him, that factor improperly allowed the jury to consider the part of Roesler's testimony that he was 70 to 80 percent sure Reid was the man Roesler saw in the store.

We need not answer the question left unanswered in *Trammell*, however, or Reid's specific argument, to address his claim. The *Trammell* question must await full briefing and argument in a future case. Simply put, even assuming PIK Crim. 3d 52.20 was improperly written and therefore improperly given, we cannot hold there is a real possibility that the jury would have rendered a different verdict had the purported error not occurred. See *Cooperwood*, 282 Kan. at 581. As discussed in detail in the analysis of issue 1, the State's evidence was too strong. Of particular damage to Reid's defense is the evidence of his unique knowledge of the location of the videotape capturing the crimes' commission and of management's ability to unlock the VCR box in the office and retrieve the tape for him.

Issue 3: *The trial court did not err in denying Reid's motion to sever and in failing to give an accomplice instruction.*

Reid next argues that the trial court erred in denying his pretrial motions to sever his trial from codefendant Williams', which he claims deprived him of the right to an accomplice instruction.

K.S.A. 22-3202(3) allows two or more defendants to be charged in the same criminal complaint, information, or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting a crime or crimes. Severance is addressed by K.S.A. 22-3204 which states: "When two or more defendants are jointly charged with any crime,

the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney."

As the "may" in K.S.A. 22-3204 suggests, severance is within the trial court's discretion. *State v. White*, 275 Kan. 580, 589, 67 P.3d 138 (2003). However, severance should occur when a defendant has established that there would be actual prejudice if a joint trial occurred. 275 Kan. at 589. Accordingly, if a defendant's motion to sever is denied, on appeal he or she has the burden of establishing that there would be actual prejudice and thus discretion was abused.

We addressed the issue of severance in *State v. Winston*, 281 Kan. 1114, 1131, 135 P.3d 1072 (2006):

"The factors to be considered in determining whether there is sufficient prejudice to mandate severance are:

' " '(1) *that the defendants have antagonistic defenses;* (2) *that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial;* (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that the confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants.' " ' [Citations omitted.]" (Emphasis added.)

Reid initially argues the first factor: antagonistic defenses. He claims that Williams' testimony and a statement made by Williams' counsel in closing arguments implicitly pointed the finger at him.

Reid highlights Williams' testimony that Williams lost track of his phone for several hours the morning of October 24 and found it later that morning in Reid's car. From phone records, law enforcement was able to determine that the person placing calls from that phone around 2:32 a.m. was in the vicinity of the store at the time of the crimes. From this, Reid argues that Williams' testimony infers that Reid had the phone during that critical time. As a result, Reid must have been at the crime scene.

Williams' testimony, however, does not establish that Reid and Williams had antagonistic defenses. Both deny involvement in the robbery and murder, and neither implicates the other. "Antagonistic defenses occur when each defendant is attempting to convict

the other or where the defenses conflict to the point of being mutually exclusive or irreconcilable. . . . Short of this type of dichotomy, defenses will not be deemed antagonistic." *White*, 275 Kan. at 590.

*White* relied in part upon our decision in *State v. Pham*, 234 Kan. 649, 655, 675 P.2d 848 (1984), where we stated that antagonism requires the codefendants' accounts be on a "collision course":

"[I]n order to reverse a district court denial of severance:
'[T]he accounts of co-defendants [must] be not merely divergent from one another but indeed "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency." To warrant a severance, in short, the accounts of co-defendants must be "on a collision course." [Citation omitted.]' "

Moreover, "the presentation of evidence by one defendant which is *inconsistent* with the evidence presented by another defendant does not make the defenses antagonistic." (Emphasis added.) *White*, 275 Kan. at 590 (citing *Pham*, 234 Kan. at 654).

Williams' testimony about his lost phone, and where he eventually found it, does not put his defense on a collision course with Reid's. Both defendants deny participating in the crimes. In addition, Reid may not have known that Williams' phone was in his car; and someone besides Reid could have been using it. Most persuasively, records show that the numbers called from Williams' phone directly after the murder were numbers that had often been called previously from his phone, *i.e.*, by him, not Reid. As we held in *White*: "While there may have been inconsistency in the evidence, there was not a dichotomy in the defenses. As presented, the defenses were not mutually exclusive." 275 Kan. at 591. And also as in *White*, there has not "been any showing of actual prejudice" of Williams' testimony. 275 Kan. at 591. Indeed, any possible prejudice was greatly ameliorated by the evidence demonstrating that the phone numbers called after the murder from Williams' phone were those previously called by Williams.

Reid next points out that in closing argument, Williams' counsel argued, "[Williams] is innocent. He didn't do this. This isn't a reasonable doubt case. He didn't do it. We know who did, and there

wasn't any help." With this argument, counsel may have inappropriately implicated Reid. However, "who" is not identified. More important, for this error to require reversal, Reid must show that it actually prejudiced him. *White*, 275 Kan. at 589. No such showing has been attempted.

Reid does claim, however, that he can show prejudice under the second factor described in *White*. There, a defendant must demonstrate " ' " 'that important evidence in favor of one of the defendants which would be admissible on a separate trial would not be allowed on a joint trial.' " ' " *White*, 275 Kan. at 590. Reid does not claim that different *evidence* would be admitted; he claims that in severed trials, different *instructions* would have been given. Because this is not one of the identified factors, Reid's argument fails.

Even if we accept Reid's expansion of our case law, he still cannot prevail. He specifically contends that the jury improperly viewed Williams' testimony to be as credible as all other witnesses' because it was not given an accomplice instruction, which he asserts it would have received if Williams were testifying at Reid's separate trial. We disagree for several reasons. First, any jury would naturally be skeptical of the testimony of a codefendant in a joint murder trial.

Second, this particular jury's findings contradict Reid's position. The jury was instructed that it should "consider and weigh everything" including "testimony of witnesses." It was also instructed that "[i]t is for you to determine the weight and credit to be given the testimony of each witness. You have a right to use common knowledge and experience in regard to the matter about which a witness has testified." A jury is presumed to follow the instructions given to it (*State v. Kunellis*, 276 Kan. 461, 484, 78 P.3d 776 [2003]), and apparently it did so here when it acquitted Reid of all five crimes in which Williams implicated him: the vehicle burglaries and thefts. And it convicted Reid of the crimes in which Williams did *not* implicate him—murder and armed robbery, for which both defendants disclaimed any participation. These findings do not indicate that Reid was prejudiced by the failure to sever and the failure to give an accomplice instruction. As a result, he has not shown that the trial court abused its discretion.

Issue 4: *The trial court did not violate Reid's due process and jury trial rights by failing to instruct the jury on lesser included homicides and robbery.*

Reid next argues that the trial court erred in failing to instruct on certain lesser included instructions, *i.e.*, second-degree intentional murder, second-degree reckless murder, involuntary manslaughter, and robbery.

Because Reid did not request these instructions we must determine whether failing to give the instructions was clearly erroneous. K.S.A. 22-3414(3). As mentioned, instructions are clearly erroneous if the appellate court finds " ' "there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." ' " *Cooperwood*, 282 Kan. at 581.

Our threshold question is whether any error occurred, *i.e.*, whether a jury could reasonably convict the defendant of the lesser offense based on the evidence presented. *Cf. State v. Sappington*, 285 Kan. 158, 163-65, 169 P.3d 1096 (2007). As we stated in *State v. White*, 284 Kan. 333, 161 P.3d 208 (2007):

" ' "A trial court must instruct the jury on a lesser included offense 'where there is some evidence which would reasonably justify a conviction' of the lesser offense. . . . 'However, the duty to so instruct arises only where there is evidence supporting the lesser crime.' [Citation omitted.] An instruction on a lesser included offense is not required if the jury could not reasonably convict the defendant of the lesser included offense based on the evidence presented." ' [Citation omitted.]" 284 Kan. at 347 (quoting *State v. Drennan*, 278 Kan. 704, 712-13, 101 P.3d 1218 [2004]).

As the lesser included offense of first-degree murder, second-degree murder "is the killing of a human being committed: (a) Intentionally; or (b) unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 21-3402.

The lesser included offense, involuntary manslaughter, "is the unintentional killing of a human being committed: (a) Recklessly; (b) in the commission of, or attempt to commit, or flight from any felony, other than an inherently dangerous felony." K.S.A. 21-3404.

As the lesser included offense of aggravated robbery, robbery "is the taking of property from the person or presence of another

by force or by threat of bodily harm to any person." K.S.A. 21-3426. Aggravated robbery is defined as robbery "committed by a person who is armed with a dangerous weapon or who inflicts bodily harm upon any person in the course of such robbery." K.S.A. 21-3427.

Under our facts, there is no evidence whatsoever that Salim was killed recklessly, unintentionally, or without premeditation. Among other things, he was shot in the back of the head while lying face down on the floor of his store that was being robbed. Additionally, because Reid's entire theory of defense was that he was not present during the crimes' commission, it is difficult to understand how, as alternatives to first-degree premeditated murder, he could have instead killed Salim unintentionally, recklessly, or without premeditation. Given his "absence" defense, it is additionally difficult to understand how, as an alternative to aggravated robbery, he could have instead taken the money from Salim's presence so as to constitute simple robbery under K.S.A. 21-3426. Given Salim's death, the robbery was certainly aggravated because it was committed by a person armed with a dangerous weapon or who inflicted bodily harm upon Salim during the course of it.

Because there was no evidence upon which the jury could reasonably convict Reid of these lesser included offenses, the trial court's failure to instruct on them is not erroneous, much less clearly erroneous. *Cf. Sappington*, 285 Kan. at 163-65.

Issue 5: *Reid was not deprived of his right to a fair trial by cumulative error.*

Reid next argues that cumulative error requires reversal of his conviction and remand for a new trial.

Cumulative trial error requires reversal when the totality of the circumstances substantially prejudiced the defendant and denied the defendant a fair trial. We have often held that reversal is not required if the evidence is overwhelmingly against the defendant. *State v. Bryant*, 276 Kan. 485, Syl. ¶ 7, 78 P.3d 462 (2003). As we recently suggested in *State v. Hunt*, 285 Kan. 855, 873, 176 P.3d 183 (2008), however, the converse is not true: the lack of overwhelming evidence is not dispositive of the issue. Instead, we look

at the totality of the circumstances and assess whether the defendant received a fair trial.

Even if we assume that Williams' counsel's remarks during closing arguments were erroneous, this one error does not demonstrate substantial prejudice and denial of a fair trial. And as discussed in detail in the analysis of issue 1, the State's evidence may not have been overwhelming, but it was substantial. Especially damaging to Reid was the evidence of his unique knowledge of the location of the videotape capturing the crimes' commission and of Salim's ability to unlock the VCR box in the office and retrieve the tape for him. Consequently, reversal on the basis of cumulative error is not warranted.

Issue 6: *The trial court did not err in finding that Reid killed for monetary gain.*

Reid next claims that the trial court erred in finding that he killed Salim for monetary gain, which the court used to support imposition of the hard 50 sentence. See K.S.A. 21-4636(c). He recites our typical standard of review:

" ' "When a defendant challenges the sufficiency of evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence." [Citations omitted.]' " *State v. Baker,* 281 Kan. 997, 1018, 135 P.3d 1098 (2006).

Reid's argument is based entirely upon the sequence of events. He specifically claims that because the killing followed the robbery—Petree testified that he heard a shot as he approached the store and a few seconds later saw a man run out—the killing gained the shooter nothing he did not already have just before the killing. Accordingly, the killing could not have been performed for monetary gain. We believe that Reid's argument is more accurately characterized as one of statutory interpretation, a question of law over which we have unlimited review. See *State v. White,* 279 Kan. 326, 332, 109 P. 3d 1199 (2005).

The statute that lists the aggravating factors to support imposition of the hard 50 sentence, K.S.A. 21-4636, states in relevant part: "Aggravating circumstances shall be limited to the following: . . . (c) The defendant committed the crime for the defendant's self or another *for the purpose of receiving money or any other thing of monetary value."* (Emphasis added.)

The facts and holding of this court's decision in *State v. Vontress,* 266 Kan. 248, 970 P.2d 42 (1998), directly contradict Reid's sequential argument. Vontress was convicted of first-degree murder, aggravated robbery, aggravated burglary, and criminal possession of a firearm. Based upon the trial court's finding that the killing occurred to facilitate the taking of money or valuables, it imposed a predecessor sentence to the hard 50: the hard 40. 266 Kan. at 259. Similar to Reid's position in the instant case, Vontress argued that because the killing occurred *after* the taking of the property was completed, it was not done in furtherance of the robbery, *i.e.,* for monetary gain. This court rejected his argument:

"The fact that the shooting occurred after Vontress had taken [the victim's] money from him is not relevant. *Vontress committed the crimes for which he was convicted for the purpose of obtaining money and drugs.* During the commission of the robbery, Vontress or his accomplice killed [the victim]. Therefore, the crime was committed for the purpose of obtaining money and drugs, an aggravating circumstance which supports the imposition of the mandatory 40-year prison sentence." (Emphasis added.) 266 Kan. at 259.

In short, the *Vontress* court held that this aggravating factor does not require a specific sequence, *i.e.,* it does not require that the defendant first kill the victim and then steal the victim's money. Rather, this court has looked to whether the killing is connected with the robbery in order to qualify as being committed for financial gain. *Cf. State v. Murillo,* 269 Kan. 281, 7 P.3d 264 (2000) (Murillo committed the murder while in the process of attempting to locate cocaine; hard 40 warranted); *State v. Cromwell,* 253 Kan. 495, 513, 856 P.2d 1299 (1993) (evidence that defendant committed the murder for the purpose of obtaining money or other items of value; hard 40 warranted); *State v. Kingsley,* 252 Kan. 761, 790, 851 P.2d 370 (1993) (evidence supports a finding that defendant

went to victim's house with the intention of killing her and taking her money and valuables; hard 40 warranted).

Were we writing on a clean slate, we might be inclined to revisit the question of whether, as the concurrence argues, the legislature intended this particular statutory aggravator to apply only to situations such as murder for hire. However, our slate carries 15 years of decisions issued since the passage of K.S.A. 21-4636(c). The legislature apparently has taken no exception to our interpretations, by statutory amendment or otherwise. As a result, we reject Reid's argument.

Issue 7. *The Kansas hard 50 sentencing scheme is constitutional.*

For his last claim of error, Reid challenges the constitutionality of Kansas' hard 50 sentencing scheme under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), and *Jones v. United States*, 526 U.S. 227, 143 L. Ed. 2d 311, 119 S. Ct. 1215 (1999). He argues that the statute is unconstitutional because it does not allow a criminal defendant the right to have a jury determine beyond a reasonable doubt all the facts which might increase the maximum penalty for first-degree murder.

This court has de novo review of constitutional questions. *State v. Kirtdoll*, 281 Kan. 1138, 1151, 136 P.3d 417 (2006).

This court has previously rejected the same challenge in numerous cases. See *Kirtdoll*, 281 Kan. at 1151; *State v. Oliver*, 280 Kan. 681, 708, 124 P.3d 493 (2005); *State v. Wilkerson*, 278 Kan. 147, 160, 91 P.3d 1181 (2004); *State v. Hebert*, 277 Kan. 61, 107-08, 82 P.3d 470 (2004); and *State v. Douglas*, 274 Kan. 96, 111-12, 49 P.3d 446 (2002) *cert. denied* 537 U.S. 1198 (2003). We see no reason to retreat from that position now.

Affirmed.

JOHNSON, J., concurring: I write separately only to air my view of the meaning of K.S.A. 21-4636(c). The provision speaks to a defendant murdering someone "for the purpose of receiving" money or property. In my view, that language refers to the circumstance where the defendant's purpose in killing the specific victim was to receive money or property as a direct consequence of the murder, *e.g.*, a murder-for-hire or a killing to obtain an inheritance

from the victim.

However, I acknowledge that our long-standing precedent has been to construe the language as encompassing a murder which occurs as a by-product of a robbery or burglary. Generally, in those instances, I perceive that the killer's purpose in killing the victim is to make it easier to *take* money or property or to avoid detection for the property crime. The purpose of the murder is not to *receive* money or property because of the particular victim's death. Nevertheless, I feel constrained by the principle of stare decisis to join in the application of the settled law in this state.

LUCKERT, J., joins in the foregoing concurring opinion.