(280 P.3d 805)
No. 104,295

STATE OF KANSAS, *Appellee*, v. STEVEN HOWARD WEIS,
*Appellant*.
Petition for revew granted June 21, 2016.

Opinion filed June 15, 2012.

*Rachel L. Pickering,* of Kansas Appellate Defender Office, for appellant.

*Ellen H. Mitchell,* county attorney, and *Derek Schmidt,* attorney general, for appellee.

Before PIERRON, P.J., GREEN and BUSER, JJ.

BUSER, J.: A jury found Steven H. Weis guilty of two counts of reckless aggravated battery, K.S.A. 21-3414, and one count of criminal use of a weapon, K.S.A. 21-4201(a)(1). Steven appeals his convictions and sentencing. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

This case arose from a disturbance between Steven and Anthony Napoleone, Thomas Nece, and Justin Lakkari in the early morning hours of Sunday, July 13, 2008. Anthony and Justin were friends. Steven had been dating Alicia Napoleone, Anthony's sister and Thomas' stepsister. At the time of this incident, Steven was living on a farm near Brookville. Alicia lived in Salina.

There was some evidence that Steven was not on friendly terms with Anthony, Thomas, and Justin. Specific disagreements, however, were not admitted at trial. These included that Anthony disliked Steven for introducing Alicia to methamphetamine use, that Steven had fought Justin after hitting Justin's girlfriend, and that Steven had fought Thomas in a bar. The trial court reasoned that even if the four men "had 20 fights in the past or 20 arguments in the past," "those matters were settled" and were not "really relevant as to what happened" on July 13, 2008.

On Saturday evening, July 12, 2008, Alicia went out drinking with Anthony, Thomas, Justin, and others. Alicia had met the group at a house belonging to Ryan and Chelsea Haden. The plan was to ride in the Hadens' van and visit drinking establishments. At about 1:30 a.m., on Sunday, July 13, 2008, Alicia was still out partying with the group when Steven called to say he was on his way to Salina to spend the night with her.

After receiving Steven's phone call, Alicia left the group and started walking towards her house. Steven soon arrived with his stepbrother, who was giving him a ride. The men picked up Alicia and drove to the Hadens' house to retrieve Alicia's vehicle, an older Jeep in poor mechanical condition. After Steven's stepbrother left, Steven and Alicia discovered the Jeep would not start. By that time, the group which had been partying returned to the Hadens' house. From this point on, the accounts of what occurred were dramatically different.

At trial, Alicia testified that she and Steven began walking to her house after one of the group approached the Jeep. Steven agreed, adding "[t]hat's when I found out that her friends, family were there." Steven said he told Alicia, "I was going to go, she can come if she wanted to," and that Alicia had to run "around the Jeep to catch up with me." Of note, Steven and Alicia specifically denied there was any argument or violence between them while they were at or around the Jeep.

Alicia testified that she soon noticed Anthony, Thomas, and Justin following them. According to Alicia, Anthony and Thomas started yelling at Steven, calling him "a bitch and a pussy," and "telling him to come back and fight." Alicia said she told Steven to keep walking.

Alicia said Anthony, Thomas, and Justin continued to follow them, and she "eventually turned around to kind of stop it, because it was just kind of monotonous." She again told Steven to keep walking. Alicia testified that Anthony passed by her towards Steven with a look of anger on his face. Alicia tried to talk to Thomas and Justin, but they soon bolted past. Alicia testified she turned around and "all four of them . . . were all kind of fighting together."

In his defense, Steven's testimony substantially corroborated Alicia's testimony. Steven said the followers were "shouting, hey, pussy, come back here and fight" and that he recognized Anthony's voice among them. Steven said Alicia "stopped to talk to her brothers and she told me to keep walking." He said he heard "somebody running up behind me" and that when he turned it was Anthony "about a foot away from me . . . and just yelling, leave his sister alone or he was going to kick my ass." Steven testified Thomas ran up "waiving [*sic*] something shinny [*sic*]" and the "[n]ext thing I know Anthony is tackling me at my feet." Steven said he did not swing at Anthony and that he was eventually able to free himself and run away.

Anthony, Thomas, Justin, and the other State's witnesses provided a markedly different account. Anthony testified that after the group had returned to the couple's house, he noticed Steven and Alicia arguing in the Jeep. Anthony said he then saw Steven "smack her in the face." Anthony said he "took a deep breath and minded my own business for a second."

Anthony stated that Steven then left the Jeep and that Alicia followed him. But, according to Anthony, Steven "smacked her again" and "turned back to me and said, what's the matter, pussies, you not going to fight me tonight, something like that." Anthony said this statement "pushed my button . . . [s]o, I started walking after him." When asked why he had followed Steven, Anthony answered, "Because I was angry that he had hit my sister."

Anthony testified that Steven and Alicia stopped together "and waited for me." Anthony admitted, "I was screaming at him," but he could not recall at trial what he had said. Anthony said Alicia was screaming as well, but at trial he had "no idea" what she said. His next memory was Steven taking a swing at him. Anthony said he ducked and fell to the ground. He was unable to feel his legs.

Thomas testified regarding the events in the early morning. He testified that he was entering the Hadens' house when "someone said that Steven and Alicia were out front arguing and then Justin said that he . . . saw him hit her." Thomas recalled that Steven and Justin "exchanged some words," and then Steven "turned around.

He said, what, you pussies don't want to fight tonight." At that point, Thomas said, Steven "backhanded" Alicia.

Thomas said he approached Steven and told him, "[H]ey, man, you can't be doing that shit, what's your problem." Thomas said Steven replied, "[expletive deleted] you, whatever, I'll do what I want, pussies, [you] can't do anything to stop me, or something like that." Thomas agreed with Anthony that Steven and Alicia stopped together, and he agreed with Alicia that it was Anthony who approached the couple because "that's his blood sister, so he's like, you know, I'll go take care of this." Soon after, according to Thomas, Steven "grabbed Anthony and hit him in the back, and then Anthony was laying [*sic*] on the ground."

Justin also testified at trial. He was inside the Hadens' house when he heard someone yell. He looked out and saw Steven and Alicia outside the Jeep. Justin said he "witnessed [Steven] either punch or slap [Alicia]. I don't know exactly what it was. But he hit her."

Justin said Steven and the other men were yelling at each other, but he could not recall in detail what each one said. He did remember that Anthony "said something about hitting my sister. He said, why don't you do that over here, or something like that, in front of my face."

Justin said Anthony and Thomas followed Steven and Alicia as they walked away, but "I couldn't see very well. I didn't have my glasses on." Justin and his wife followed at some distance while the four individuals "kept yelling at each other." Eventually, when "Anthony had gotten close to Steven," Steven "kind of turned around and punched." Justin said Anthony fell to the ground and did not get up.

Justin said he put Steven in a bear hug, that the two fell and wrestled on the ground, and that Steven managed to break loose and began hitting him. Justin said he was scratched and cut, but that he never saw a weapon. There was broken glass at the scene because Alicia threw beer bottles at Thomas and Justin during the fight.

The State also called Thomas' wife, Lynnsey Nece, and Justin's wife, Jennifer Ruston Lakkari, whose testimony was generally con-

sistent with that of Anthony, Thomas, and Justin. Lynnsey, who as the designated driver was not drinking that night, testified, "I heard Steven say, what, you don't want to fight tonight, pussies. And then about that time it looked as if he had struck Alicia." Anthony's girlfriend, Shannon Jay, similarly agreed with the account given by Anthony, Thomas, and Justin.

In his defense, Steven called Jeremy Watkins, an investigator with the Salina Police Department, who interviewed Anthony at the hospital after the fight. Watkins said Anthony told him that "he didn't like Steven and Alicia being together, and that he went out to talk to Alicia and try to get her to come back to the house and stay away from Steven." Anthony did not tell Watkins that Steven had slapped Alicia.

Whatever triggered the fight, the tragic result was that Anthony's spinal column was severed by the broken tip of a knife which lodged in his spine and paralyzed him from the rib cage down. Forensic testing matched the broken tip with a knife found at the scene. Additionally, Thomas suffered numerous stab wounds, and DNA taken from the remaining portion of the knife's blade matched a DNA sample taken from Thomas.

At trial, Steven denied the possession or use of the knife. But when Steven called 911 after the fight, he reported that someone had been stabbed. And when interviewed by the police soon thereafter, Steven said he "didn't know" if he had carried a knife. Steven told the police he "hit one of the men," that "he might have had something in his hand," and that he "might have had some keys in his hand." At trial, however, Steven admitted that he had no keys during the fight.

The State charged Steven with aggravated battery against Anthony, Thomas, and Justin and with criminal use of a weapon. The jury returned guilty verdicts on the lesser included offenses of reckless aggravated battery as to Anthony and Thomas, but acquitted Steven of aggravated battery with respect to Justin. The jury also returned a guilty verdict on the criminal use of a weapon charge. The district court sentenced Steven to 41 months' imprisonment. He appeals.

## ADMISSION OF K.S.A. 60-455 EVIDENCE

Prior to trial, the State moved to admit evidence under K.S.A. 60-455 that Steven slapped Alicia in the presence of the group shortly before the stabbing. The State argued the slap was "necessary . . . to prove motive" and "relevant to show the reason why the altercation began." Additionally, the State argued that because Steven's defense theory "involve[s] self-defense," together with the victims' statements, "motive is a material issue in this case."

The trial court conducted a K.S.A. 60-455 hearing. Steven's counsel disputed the propriety of an instruction on motive, arguing the only possible motive shown by the challenged evidence was "the reason these three people attacked my client." The trial court allowed the evidence, but it did not instruct the jury on motive. Rather, it instructed the jury: "Evidence has been admitted tending to prove that the defendant committed battery against Alicia Napoleone. This evidence may be considered solely for the purpose of explaining the events leading up to the altercation on July 13, 2008."

In *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006), our Supreme Court directed: "Henceforth, admissibility of any and all other crimes and civil wrongs evidence will be governed by K.S.A. 60-455." Steven asserts in passing that the trial court admitted "res gestae evidence . . . independent of K.S.A. 60-455." Our general rule is to disregard passing assertions, *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010), but Steven's assertion is contrary to the record.

The trial court did not admit the evidence Steven slapped Alicia independent of K.S.A. 60-455. The State moved for the admission of this evidence pursuant to that statute and at the hearing the trial judge announced, "I have before me today the State's Motion to Admit Evidence pursuant to K.S.A. 60-455." The trial court then carefully conducted a thorough analysis of the challenged evidence in accordance with the dictates of K.S.A. 60-455 and *Gunby*. Given this record, we see no reason to consider a supposed use of res gestae evidence independent of K.S.A. 60-455. We will consider Steven's primary argument, however, that the trial court "did not

*correctly apply* the K.S.A. 60-455 three-part test . . . set out in *Gunby.*" (Emphasis added.)

Our Supreme Court has refined the test for the admissibility of evidence under K.S.A. 60-455 since *Gunby*:

"Determining whether evidence was properly admitted pursuant to K.S.A. 60-455 requires several steps. The appellate court must determine that the fact to be proven is material, *e.g.*, concerning intent, motive, knowledge, or identity. In other words, the court must determine whether the fact has a legitimate and effective bearing on the decision in the case. The appellate court standard for reviewing materiality is de novo. The appellate court must also determine whether the material fact is disputed, *i.e.*, the element or elements being considered must be substantially at issue in the case. The appellate court must also determine whether the evidence presented is relevant to prove the disputed material fact, *i.e.*, whether it has any tendency in reason to prove that fact. The appellate court reviews relevance—in particular, the probative element—of K.S.A. 60-455 evidence for abuse of discretion. The burden of proof is on the party alleging the discretion is abused. The court must also determine whether the probative value of the evidence outweighs the potential for producing undue prejudice. The appellate standard for reviewing this determination is abuse of discretion." *State v. Hollingsworth*, 289 Kan. 1250, Syl. ¶ 6, 221 P.3d 1122 (2009).

Steven claims the evidence that he slapped Alicia was not in dispute, was not material, and was more prejudicial than probative. We address these claims in order.

Steven maintains the evidence was not disputed based solely on the testimony of Anthony, Thomas, and Justin that they "chose to pursue" Steven "after they either saw or heard that Steven had slapped Alicia." Of course, this was their testimony. But Steven and Alicia both specifically *denied* that Steven slapped Alicia. If Steven did not slap Alicia, then Anthony, Thomas, and Justin chose to pursue Steven for another reason. Regardless, the challenged evidence was highly disputed. As detailed earlier, we may easily determine that the challenged evidence was in dispute.

We next consider whether the evidence was material—whether it had a legitimate and effective bearing on the decision in the case. Steven argues it did not because it "did not tend to prove *any element of the crimes charged*." (Emphasis added.) Whether or not the evidence was material to the elements of the crimes, we believe it was very material to Steven's claim of self-defense.

The self-defense instruction, which was patterned, in part, from PIK Crim. 3d 54.22, entitled "Initial Aggressor's Use of Force," provides:

"*A person who initially provokes the use of force against himself* is not permitted to use force to defend himself unless the person reasonably believes that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the other person or the person has in good faith has withdrawn from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and stop the use of force, but the other person continues or resumes the use of force." (Emphasis added.)

Steven does not challenge this instruction on appeal. Therefore, if the jury had decided the case based on self-defense, it would have had to consider whether Steven initially provoked the use of force against himself. Evidence that Steven slapped Alicia in the presence of her family members would certainly have been material to that finding. The slap could have been understood as an integral part of Steven's taunts to Anthony, Thomas, and Justin— a display of violent mastery over Alicia coupled with a mocking, verbal challenge to her male family members.

Steven denied the slap and the taunt, and Alicia supported his testimony. But whether Steven had slapped Alicia contemporaneously with his taunts to her family members was a question for the jury. See *State v. Hunt*, 257 Kan. 388, 394, 894 P.2d 178 (1995). The evidence that Steven slapped Alicia was therefore material under K.S.A. 60-455. See *Gunby*, 282 Kan. 39, Syl. ¶ 3 ("The list of material facts in K.S.A. 60-455 is exemplary rather than exclusive."); *State v. Corchado*, 188 Conn. 653, 668, 453 A.2d 427 (1982) (evidence that defendant had slapped manslaughter victim "was relevant because it clearly had a bearing on the existence of facts the jury were ultimately required to determine, i.e., on the issue of self-defense").

The final step in the K.S.A. 60-455 analysis is to consider whether the evidence that Steven slapped Alicia was more prejudicial than probative. Steven denies the evidence was probative because "the witnesses could have been instructed to say that they were concerned about Alicia and thus, decided to follow the cou-

ple." This argument seems to concede the probative nature of the evidence while proposing to recharacterize it to the jury in a watered-down fashion. For a trial court to order an eyewitness to testify not to perceived facts, but in a manner reformulated by the trial court seems fraught with peril. Moreover, to have instructed eyewitnesses to testify "they were concerned about Alicia" without informing the jury as to why, in fact, they were concerned about her would leave the jury without relevant and probative evidence surrounding the circumstances of this incident. It would also have unfairly and inaccurately withheld from the jury the visceral impact of Steven's taunting as alleged by the State's witnesses. If the jury was to decide self-defense as instructed, it could not have done so from manufactured and vague testimony.

In fact, Steven essentially concedes the probative nature of the challenged evidence in this case by stating: "For three days, the jury heard over ten times from several State witnesses that Steven had struck Alicia. With this type of testimony, the jury could have been misled that Steven was the initial aggressor because he first struck Anthony's and [Thomas'] sister." We agree the jury could have reached this conclusion, but that does not mean it would have been "misled." The jury was not obliged to find, as Steven maintains on appeal, that "Anthony, [Thomas], and Justin were the initial aggressors."

Evidence that Steven slapped Alicia was also not unfairly prejudicial. From the perspective of the State's eyewitnesses, it was an integral part of the conflict, not an act gratuitously introduced to suggest, as Steven maintains on appeal, that he "without hesitating, battered people." It was therefore distinguishable from the sort of propensity evidence which is more typically prejudicial than probative. See *State v. Cook*, 45 Kan. App. 2d 468, 474, 249 P.3d 454 (2011) ("[T]he only purpose of presenting evidence of his prior marijuana conviction was to show his propensity to possess marijuana.").

For all of these reasons, the trial court did not err in admitting evidence, in accordance with K.S.A. 60-455, that Steven slapped Alicia immediately before the stabbing.

## JURY INSTRUCTIONS

As mentioned earlier, the trial court provided a limiting instruction regarding how the jury should properly consider the K.S.A. 60-455 evidence. The trial court also instructed the jury on self-defense. The trial court omitted the following sentence from the "Use of Force in Defense of Person" pattern instruction, PIK Crim. 3d 54.17: "When use of force is permitted as (self-defense) . . . there is no requirement to retreat." Additionally, the trial court also gave a non-PIK self-defense instruction based on *State v. Bradford*, 27 Kan. App. 2d 597, 601-02, 3 P.3d 104 (2000): "Self-defense requires intentional conduct. A charge of recklessness involves an unintentional act. Self-defense is not available as a defense against a charge of reckless conduct."

Steven raises two challenges to the jury instructions. First, he claims error in the wording of the K.S.A. 60-455 limiting instruction. Steven now contends the trial court should have instructed the jury "that the battery evidence could be consider[ed] for proving motive. If the jury had been properly instructed that the evidence could be used to show motive, then the jury could have considered Steve[n]'s motive." Steven does not explain how the evidence he slapped Alicia showed his motive to commit the charged crimes or, if it did; how the jury's use of the evidence for that purpose would have assisted him at trial. Steven's counsel at the instructions conference, a different counsel than at the K.S.A. 60-455 hearing, did object to the omission of motive, although the basis was unclear.

Second, Steven complains that the self-defense instructions omitted the no-duty-to-retreat language. The State correctly notes that "[t]here is no explanation on the record" why the no-duty-to-retreat language was omitted. The record does show that the trial court and counsel "spent considerable time reviewing the jury instructions" off the record, so perhaps the omission was not inadvertent. In any event, neither party objected to the omission when the jury instructions were submitted to the jury.

"When a party has objected to an instruction at trial, the instruction will be examined on appeal to determine if it properly and

fairly states the law as applied to the facts of the case and could not have reasonably misled the jury." *State v. Appleby*, 289 Kan. 1017, 1059, 221 P.3d 525 (2009)."An appellate court reviewing a [trial] court's giving or failure to give a particular instruction applies a clearly erroneous standard where a party neither suggested an instruction nor objected to its omission." *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009); see K.S.A. 22-3414(3). Clear error is shown where an appellate court is "firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]" 288 Kan. at 451-52.

Critical to the application of this law in the present case is the fact that the jury did not base its verdict on self-defense. The jury was instructed, as noted above, that self-defense did not apply to reckless conduct, and Steven does not appeal this instruction. Of course, jurors are presumed to follow their instructions. See *State v. Reid*, 286 Kan. 494, Syl. ¶ 18, 186 P.3d 713 (2008). Additionally, the prosecutor informed the jurors that if "you find that the elements of reckless agg[ravated] battery are met," then "self-defense is not available. It is not a defense to reckless agg[ravated] battery." Because the jury convicted Steven only on the lesser included offenses of reckless aggravated battery, and because the criminal use of a weapon conviction did not turn on the use of the knife but only on the possession or carrying the knife, the jury had no need to consider self-defense with regard to these two crimes.

Quite simply, the omission of motive from the K.S.A. 60-455 limiting instruction did not come into play. As Steven's counsel observed at the K.S.A. 60-455 hearing, the "motive" suggested by such an instruction would be the motive of Anthony, Thomas, and Justin to fight Steven. That would go to the initial aggressor question, but since the jury convicted on reckless, not intentional, conduct, the materiality of such a motive was no longer at issue. Given the jury's verdict, Steven could not have been prejudiced by the omission.

Moreover, if the trial court had written the limiting instruction as Steven now urges, the jurors might have inferred, as Steven does on appeal, that the motive in question was *Steven's* motive to com-

mit the charged crimes. In *State v. Carapezza*, 286 Kan. 992, 998, 191 P.3d 256 (2008), for example, a district court allowed evidence of a defendant's drug habit as res gestae evidence "without applying the analysis required by K.S.A. 60-455." Of course, that was improper, but our Supreme Court went on to consider under the statute whether the evidence was "probative of the motive for robbing" the victim. 286 Kan. at 999. Motive is one of the material facts listed in K.S.A. 60-455, and our Supreme Court thought the evidence "[p]roviding a motive for Carapezza's involvement establishes a material or logical connection to the inference that she participated in the crime." 286 Kan. at 999.

In the present case, however, we see no reason why the jury should have considered evidence that Steven slapped Alicia as *his* motive for aggravated battery on Anthony, Thomas, or Justin. The risk in providing that instruction is that the jury could have inferred a motive of pure malice, which could very easily have become an inference of propensity—which is exactly the danger that a K.S.A. 60-455 limiting instruction is designed to prevent. Under the unique facts of this case, we believe the trial court properly limited the jury's consideration of the K.S.A. 60-455 evidence.

We do not hold that the K.S.A. 60-455 limiting instruction given in the present case was the best or sole way to instruct the jury. Notably, Steven does not appeal the language used in the instruction, only the omission of a reference to motive. Our holding is that, given the evidence before it, the trial court did not err by omitting motive.

The other aspect of the instructions Steven appeals, the omission of the no-duty-to-retreat language, also did not come into play. That language again applied only to self-defense, and self-defense did not apply to any of the crimes of conviction. Thus there was not a real possibility the jury would have rendered a different verdict if it was instructed as Steven suggests. A more likely result would have been juror confusion based on the tension between the no-duty-to-retreat language and the initial-aggressor instruction, which required the initial aggressor to have "used every reasonable means to escape."

## SUFFICIENCY OF THE EVIDENCE

On appeal, Steven does not contest that Anthony suffered great bodily harm or that Thomas sustained bodily harm from a knife. Instead, Steven contends there was no substantial evidence to prove that he was the person who used a knife during the commission of either of the aggravated batteries. Similarly, Steven argues, with respect to the criminal use of a weapon conviction, "[n]ot one State's witness could testify that he or she saw [him] possessing or carrying" the knife.

Our standard of review provides:

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011).

We begin our analysis with an obvious fact. Someone used, and therefore possessed or carried, the knife which injured Anthony and Thomas. There was testimony that Anthony was the first of the three men to reach Steven, and the evidence indicated he fell almost immediately when the tip of the knife severed his spinal column. There was also testimony that Steven struck Anthony in the back immediately preceding his fall. Thomas was apparently the next to reach Steven, and his blood was found on the blade of the knife. All of this evidence, viewed in the light most favorable to the prosecution, points to Steven's use of the knife.

This inference is greatly strengthened by Steven's inculpatory statements after the fight. Steven called 911 and said someone had been stabbed. When asked by the police if he had carried a knife, Steven said he did not know. More importantly, he said he might have had something in his hand when he hit one of the men, perhaps his keys. This admission, with an attempt at mitigation—the substitution of keys for a knife—shows a consciousness of guilt. See *Appleby*, 289 Kan. at 1061 (discussing law on "evidence to establish the defendant's consciousness of guilt"). Viewed in the light most favorable to the prosecution, a rational factfinder could have found

Steven guilty beyond a reasonable doubt of both crimes of conviction.

### OFFENDER REGISTRATION PURSUANT TO THE KANSAS OFFENDER REGISTRATION ACT

The trial court ordered Steven to register as an offender under K.S.A. 2010 Supp. 22-4902(a)(7) based on its finding that he had used a deadly weapon in the commission of reckless aggravated battery. This statute is part of the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 *et seq*. Steven contends the district court's finding violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution under *Blakely v. Washington*, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), because a jury did not make the finding which resulted in an increased penalty for Steven's crimes.

This is a new argument on appeal, but we will consider it because it alleges a violation of fundamental rights. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010). Our review is unlimited. See *McComb v. State*, 32 Kan. App. 2d 1037, 1041, 94 P.3d 715, *rev. denied* 278 Kan. 846 (2004).

Steven acknowledges *State v. Chambers*, 36 Kan. App. 2d 228, 239, 138 P.3d 405, *rev. denied* 282 Kan. 792 (2006), where this court held a district court could find a crime was sexually motivated for purposes of sex offender registration. The *Chambers* panel reasoned that because sex offender registration under KORA did not increase the maximum sentence, it did not engage the protections announced in *Blakely* and *Apprendi*. Steven contends, however, "[t]he *Chambers* decision was wrong because it narrowly interpreted the rule in *Apprendi* by holding that it should only be applied to increased sentences, not increased punishment."

*Chambers* distinguished between sentences and punishment based on precedent of the Kansas Supreme Court. See 36 Kan. App. 2d at 237-39. This court is required to follow such precedent absent some indication our Supreme Court is departing from its

previous position. *State v. Jones*, 44 Kan. App. 2d 139, 142, 234 P.3d 31 (2010), *rev. denied* 292 Kan. 967 (2011).

*Chambers* also cited *Smith v. Doe*, 538 U.S. 84, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), where the United State Supreme Court held sex offender registration posted on the Internet was not punishment for ex post facto purposes. The Court reached this conclusion despite the "adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism." 538 U.S. at 99. The Court reasoned the "purpose and principal effect of notification are to inform the public for its own safety, not to humiliate the offender." 538 U.S. at 99. Since Steven alleges he is subject to "punishment" based on "the certain stigma attached" to offender registration, we can rely on *Smith* here.

Steven provides no evidence of stigma. We are therefore left with whatever inferences we might make from the registration itself. We do not believe these inferences are sufficient to show Steven was deprived of his fundamental rights. If under *Smith* the stigma attached to sex offender registration is not punishment, the stigma Steven might be expected to suffer from offender registration is not punishment.

Steven also mentions he must perform certain duties connected with registration or face prosecution under K.S.A. 22-4903, and he also must pay a $20 fee whenever reporting to a sheriff's office. See K.S.A. 2010 Supp. 22-4904(e). But Steven cites no authority holding these requirements are punishment, and he provides no reasoning supporting the conclusion. This is akin to waiving or abandoning an issue on appeal. See *State v. Berriozabal*, 291 Kan. 568, 594, 243 P.3d 352 (2010).

If we were to consider the registration requirements, we would interpret them as part of the regulatory scheme and not as punishment. In *Smith*, for example, the "[w]idespread public access" caused by posting sex offender registration on the Internet was "necessary for the efficacy of the scheme." 538 U.S. at 99. The "attendant humiliation" was "but a collateral consequence of a valid regulation." 538 U.S. at 99.

Here as well, enforcement of the registration requirements is critical to the efficacy of the scheme. Steven's exposure to further

criminal liability under K.S.A. 22-4903 is not punishment for his crimes but a means to effect the intent behind registration, which is public safety. See *State v. Cook*, 286 Kan. 766, 774, 187 P.3d 1283 (2008).

We also believe the $20 fee is not punitive but a reasonable way to reimburse sheriffs' offices for services provided in the regulatory scheme. See K.S.A. 2010 Supp. 22-4904(e) ("All funds retained by the sheriff . . . shall be credited to a special fund . . . which shall be used solely for law enforcement and criminal prosecution . . . and which shall not be used as a source of revenue to reduce the amount of funding otherwise made available to the sheriff's office."); *State v. Robinson*, 281 Kan. 538, 543, 132 P.3d 934 (2006) (characterizing BIDS fees as "recoupment" and "not fines or, indeed, any part of the punishment or sanction").

Finally, subsequent to briefing and oral argument in this case, in *State v. Unrein*, 47 Kan. App. 2d 366, Syl., 274 P.3d 691 (2012), our court specifically rejected legal arguments similar to those raised by Steven in the present case. In short, *Unrein* is dispositive of this issue.

The stigma Steven might expect to suffer from registration is not an increase in sentence or punishment but a collateral consequence of his registration as an offender. Accordingly, we do not believe the trial court's factual finding violated *Blakely* and *Apprendi*. Steven has not shown he was deprived of his fundamental constitutional rights.

### CUMULATIVE ERROR

Finally, Steven contends he was deprived of a fair trial by cumulative error. Since we have not found error, we do not find cumulative error. See *State v. Cofield*, 288 Kan. 367, 378, 203 P.3d 1261 (2009). We also conclude based on the strength of the evidence that any error which might have occurred did not deprive Steven of a fair trial. See *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010).

Affirmed.

\* \* \*

GREEN, J., dissenting: I respectfully dissent from that part of the

majority opinion which holds that the trial court properly admitted evidence of an uncharged slapping incident between Steven Weis and his girlfriend, Alicia Napoleone, under K.S.A. 60-455. Moreover, I dissent from that part of the majority opinion which holds that the trial court's self-defense instruction, which omitted the no-duty-to-retreat language from this instruction, did not deny Steven a fair trial.

*Admitting Evidence Under K.S.A. 60-455*

In instructing the jurors on how they could consider the evidence of the uncharged slapping incident, the trial judge stated, "Evidence has been admitted tending to prove that the defendant committed battery against Alicia Napoleone. This evidence may be considered solely for the purpose of explaining the events leading up to the altercation on July 13, 2008." Steven seeks a new trial contending that the evidence relating to the uncharged slapping incident was not relevant to the crimes charged.

A trial court's analysis of whether evidence is admissible under K.S.A. 60-455 requires several steps. First, the court must determine whether the evidence is relevant to prove a material fact, *e.g.*, whether the fact concerns intent, motive, knowledge, or identity. Appellate review for materiality is de novo and the list of material facts in K.S.A. 60-455 is exemplary rather than exclusive. See *State v. Gunby*, 282 Kan. 39, Syl. ¶¶ 1-3, 144 P.3d 647 (2006).

Second, the court must determine whether the material fact is in dispute. If it is in dispute, the trial court must then determine whether the evidence is relevant to prove the disputed material fact. Appellate courts review the trial court's relevance determination for abuse of discretion. Third, the court must determine whether the probative value of the evidence outweighs the potential for creating undue prejudice. Appellate review of this determination is also for abuse of discretion. Finally, if the court decides to admit the evidence, the court must give a limiting instruction notifying the jury of the specific purpose for the admission of the K.S.A. 60-455 evidence. *State v. Riojas*, 288 Kan. 379, 383, 204 P.3d 578 (2009).

*Trial Court's Ruling on State's Motion to Admit K.S.A. 60-455 Evidence*

Before trial, the trial court heard arguments on the State's motion to admit K.S.A. 60-455 evidence. The State argued that the evidence was relevant to show motive and to show the reason why the altercation began. In determining that the evidence that Steven slapped Alicia was admissible under K.S.A. 60-455, the trial court stated the following:

"Well, the incident that the State is wishing to present evidence on alleges immediately preceded the altercation in this case between the Defendant and the three alleged victims.

"The Court does believe that evidence is relevant, certainly to explain how the altercation began would be relevant to explain the course of conduct with the alleged victims approaching the Defendant and his girlfriend and so the Court is going to find that that evidence would be relevant to explain how the altercation began, the course of conduct between the parties, and it would also be relevant on the issues of motive, intent and identity and the Court does find that those material facts are in dispute."

Also before trial, Steven moved the court to reconsider its decision to admit the K.S.A. 60-455 evidence. The trial court denied Steven's motion. Steven further objected to the cautionary instruction that the trial court planned to read after the witnesses testified about the K.S.A. 60-455 evidence. Steven argued that the instruction should state that the evidence was relevant to show motive because the State argued in its motion that the slapping evidence was relevant to show motive. The trial judge disagreed and stated:

"It seems to me that that evidence would be relevant primarily to show the, you know, events leading up to the altercation or what happened immediately preceding the altercation.

. . . .

"Well, I think I'm just going to rule that the battery incident that immediately preceded this altercation is relevant for the purpose of proving or showing how the altercation began.

. . . .

"And leave out the motive."

During trial, multiple witnesses testified that they saw Steven slap Alicia on the night when the charged incidents occurred. Steven objected each time, arguing that the evidence was inad-

missible under K.S.A. 60-455. The trial court overruled Steven's objections. After each witness testified that Steven slapped Alicia, the trial court instructed the jury as follows: "Evidence has been admitted tending to prove that the defendant committed battery against Alicia Napoleone. This evidence may be considered solely for the purpose of explaining the events leading up to the altercation on July 13, 2008."

Later, at the instruction conference, Steven again objected to the form of the limiting instruction. Steven argued that originally the court admitted the evidence to show motive, but the court failed to include motive in its limiting instruction. The trial court determined that it was not going to change the limiting instruction because it had consistently given this limiting instruction throughout the trial.

*Relevancy*

The first question, then, is whether the evidence in question was relevant to prove a material fact. There are two elements of relevant evidence: a materiality element and a probative element. *State v. Houston*, 289 Kan. 252, 261-62, 213 P.3d 728 (2009). Even if the court determines that the evidence is both probative and material, the trial court must still determine whether the probative value of the evidence outweighs its prejudicial value. *State v. Hart*, 44 Kan. App. 2d 986, 1006, 242 P.3d 1230 (2010), *rev. granted* 292 Kan. 967 (2011) (pending).

K.S.A. 60-455 provides several examples of facts that are per se material. Those examples include the following: "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 60-455. As stated earlier, this list of material facts in K.S.A. 60-455 is exemplary rather than exclusive. *Gunby*, 282 Kan. at 56.

*Res Gestae*

Steven argues that the trial court erroneously admitted evidence that he allegedly slapped Alicia on the night of the altercation. The trial court implicitly admitted the evidence as res gestae, stating that it was relevant solely to explain the events leading up to the

altercation. If the trial court admitted this evidence independent of K.S.A. 60-455(b), this would have been improper. *Gunby*, 282 Kan. 39, Syl. ¶ 5. Thus, the trial court was required to measure the admission of the slapping incident against any applicable exclusionary rules. *Gunby*, 282 Kan. at 59-63.

As stated earlier, there are three requirements that must be met for evidence to be admissible under K.S.A. 60-455. First, the evidence must be relevant for a legitimate purpose other than to show propensity. Second, the evidence must be relevant to a material issue which is disputed in the case. Third, the probative value of the evidence must outweigh its potential for unfair prejudice to the defendant. *Gunby*, 282 Kan. at 48.

Here, the evidence of Steven slapping Alicia was not inextricably intertwined with the charged offenses. Although the evidence that Steven slapped Alicia helped explain the reason for the victims' anger, the slapping incident was unnecessary to the understanding about Steven's altercation with the alleged victims. For example, there was a clear break between the alleged slapping incident and Steven's confrontation with the alleged victims. The alleged victims testified that they followed Steven and Alicia for a few blocks after they saw Steven allegedly slap Alicia. This fact is very important because it means that the altercation did not immediately begin after the alleged slapping incident. These were separate incidents. It was possible to give a complete and intelligent account of the altercation between Steven and the alleged victims without delving into the details of the alleged slapping incident. For example, the altercation involving the charged offenses could have been explained sufficiently by Anthony's testimony that he did not like Steven dating his sister, Alicia. And on the night of the charged offenses, Anthony wanted Alicia to stop walking with Steven and return to her friends' house. Thus, the evidence of Steven allegedly slapping Alicia was irrelevant to the charged crimes.

For the sake of argument, even if the evidence of Steven slapping Alicia was relevant, this evidence was not relevant to prove a material fact under K.S.A. 60-455. In this case, the trial court held that the evidence was admissible to explain the events leading up to the altercation. This is not one of the factors explicitly listed in

K.S.A. 60-455; however, as stated earlier, the list of material facts in K.S.A. 60-455 is exemplary rather than exclusive. *Gunby*, 282 Kan. at 56.

Nevertheless, the State does not argue that "explaining the events leading up to the altercation" is a viable material fact under K.S.A. 60-455. In fact, I could find no decision where our Supreme Court has recognized the admission of other crimes evidence based on a material fact not explicitly listed in K.S.A. 60-455. Yet, I acknowledge that materiality could have been shown outside the eight statutory factors under certain circumstances: For example, if other evidence existed that Steven had threatened Alicia with a knife just before the altercation occurred between Steven and Alicia's brothers and friend, Steven's possession of a knife would have been relevant and material, since Steven denied possessing a knife during the altercation which was the basis for the charged offenses. But no such facts exist in our case. As a result, the res gestae evidence was inadmissible for a lack of materiality because it had no legitimate bearing on any material fact in dispute.

Moreover, I have difficulty in concluding, as the majority does, that the slapping incident was material because of Steven's claim of self-defense. The majority says that evidence that Steven slapped Alicia in the presence of her family members would have been material to whether Steven had initially provoked the use of force against himself. It seems disingenuous of the majority to argue on one hand that Steven's claim of self-defense was material under K.S.A. 60-455 and argue on the other hand that Steven was not harmed by the trial court's omission of the no-duty-to-retreat language from the self-defense instruction. Indeed, the majority says that the jury had no need to consider the self-defense instruction based on Steven's crimes of conviction. Thus, it would seem that the majority wants to "have one's cake and eat it too."

*Motive*

The State also argues that the evidence was relevant to show motive. The trial court, however, did not instruct the jury to consider the evidence based on motive. Yet, it is still necessary to determine whether the evidence was admissible to show motive.

See *State v. Reid*, 286 Kan. 494, 510, 186 P.3d 713 (2008) (while "knowledge" was not given as the reason for the trial court's admission of the evidence, that court's conclusion can be upheld on review if it was right even though the court's given reason may have been wrong). But " '[t]he erroneous admission of evidence of a crime under one exception in K.S.A. 60-455 is not made harmless merely by the fact it would have been admissible under another exception not instructed on.' " *Reid*, 286 Kan. at 511 (quoting *State v. McCorgary*, 224 Kan. 677, 686, 585 P.2d 1024 [1978]).

Our Supreme Court explained that " 'motive is the moving power that impels one to action for a definite result.' [Citations omitted.] Evidence of motive is an attempt to explain why a defendant did what he or she did. [Citations omitted.]" *State v. Wells*, 289 Kan. 1219, 1227, 221 P.3d 561 (2009).

In *State v. Engelhardt*, 280 Kan. 113, 128, 119 P.3d 1148 (2005), our Supreme Court stated: "Motive supplies the jury with some degree of explanation, responding to a juror's natural tendency to wonder why a defendant behaved in the manner described by the State. Often it is a prominent feature of the State's theory of its case."

In its brief, the State contends that the battery against Alicia shows why the victims were following Steven. The State further contends that the fact that the victims were following Steven is relevant to show Steven's motive in stabbing them. The State's argument is a non sequitur, which means it does not follow.

In arguing that the evidence was relevant to a material fact, the State, in its brief, resorted to reasoning in the deductive form: "The defendant struck Alicia, her brothers and friend confronted him and the defendant stabbed them. The evidence was relevant to show the defendant's motive." This syllogism may be reconstructed to read as follows:

Major premise: A struck B;
Minor premise: B's brother and friend confronted A;
Conclusion: Therefore, A stabbed B's brothers and friend.

Thus, from these premises one would be forced to conclude from the evidence of A slapping B alone that A would more likely

than not stab B's brother and friend. This conclusion does not necessarily follow from the premises by which it is supposed to be supported. It might, at most, furnish a reason why Alicia's brothers and friend would confront Steven. But the premises do not support an inference that men who strike their girlfriends are more likely than not to stab their girlfriends' brothers and friend when confronted by them.

Although the evidence helped explain the motive for the victims' actions, it did not help to explain Steven's motive. Of course, there are times when a defendant's motive is relevant. One example comes to mind from several scenes from a famous movie: "The Godfather." In that movie, Sonny, Don Vito Corleone's hot-headed son, played by James Caan, severely beats his brother-in-law, Carlo Rizzi, for brutalizing Michael, Fredo, and Sonny's sister, Connie. Sonny also threatens to kill Carlo if he ever beats his sister again. An angry Carlo plans his revenge against Sonny by aiding a rival crime family in Sonny's murder.

As part of the plan, Carlo beats Connie to lure the hot-headed Sonny away from the heavily fortified and guarded Corleone compound. When Sonny learns that Carlo has battered Connie again, he, unaccompanied by his body guards, gets into a car and races away from the compound to make good on his earlier threat to kill Carlo. On the way, Sonny is ambushed at a toll booth and shot to death by several men carrying Thompson submachine guns. Connie's beating by Carlo was relevant to show motive in Carlo's plan to seek revenge against Sonny for his earlier beating by Sonny. And Connie's beating by Carlo was the first link in luring Sonny away from the heavily guarded compound so Sonny could be ambushed and killed; it, also, was relevant to show that Carlo participated in the plan to kill Sonny.

Similarly, if there were other evidence that Steven had threatened to harm Alicia's brothers and friend and that Steven had slapped Alicia to provoke an altercation between him and Alicia's brothers and friend so he could harm them, this evidence would be relevant to show motive for harming Alicia's brothers and friend. Moreover, this evidence would be relevant to rebut Steven's self-

defense claim that he was an innocent bystander in the altercation. But no such motive evidence exists in this case.

A review of the record in this case fails to show how the lone evidence of Steven slapping Alicia could be used to show Steven's motive in committing the alleged crimes, other than showing Steven's propensity to commit the alleged crimes of battery. As stated earlier, prior bad acts evidence is not admissible to show the defendant's propensity to commit the charged crimes. K.S.A. 60-455(a).

Because the evidence fails to show Steven's motive, the prior bad acts evidence was inadmissible to show motive under K.S.A. 60-455(b).

## Probative versus Prejudicial

Even if the alleged slapping evidence was relevant, this does not mean it should automatically be admitted. Indeed, relevant evidence of prior crimes is inadmissible if the prejudicial impact of the evidence outweighs its probative value. *State v. Davis*, 213 Kan. 54, 58, 515 P.2d 802 (1973). In *Davis*, our Supreme Court explained the types of prejudice that can occur with admitting prior bad acts evidence:

" 'First, a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he committed this one. Secondly, the jury might conclude that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Thirdly, the jury might conclude that because the defendant is a criminal, the evidence put in on his behalf should not be believed.' " *Davis*, 213 Kan. at 58.

There is no question that the evidence that Steven slapped Alicia was prejudicial to Steven. The other crimes evidence established that not only is Steven a violent person but also a person who would batter a defenseless woman. A trial court should be conscious of the possibility of prejudicing the jury and should avoid doing so. *Davis*, 213 Kan. at 58. Here, the prejudicial effect of the evidence outweighed any probative value.

On the other hand, to the extent that the State argues that the evidence was relevant to show why the altercation began, in this case the relevant altercation was between Steven and the alleged victims, not Steven and Alicia. The State also contends that this evidence was relevant because the slap occurred just before the altercation. Although this is true, the slapping evidence was not so inextricably intertwined with Steven's altercation with the victims because there was a clear break between the alleged slap and Steven's altercation with the alleged victims. The alleged victims testified that they followed Steven and Alicia for several blocks after they saw Steven allegedly slap Alicia. This means that the altercation did not immediately start after the victims allegedly saw Steven slap Alicia. Based on these facts, it was clearly possible to give a complete and intelligent account of the altercation between Steven and the victims without mentioning the alleged slap. See *Burgos v. State*, 865 So. 2d 622, 624 (Fla. Dist. App. 2004) (domestic battery evidence was not inextricably intertwined because there was a " 'clear break' " between that incident and defendant's confrontation with the officers). This evidence should not have been admitted.

Moreover, the trial court, which granted the State's motion to admit evidence of the alleged slapping incident, paved the way for the State to elicit detailed testimony from the State's witnesses that Steven had slapped Alicia. For example, the evidence was first mentioned in the State's opening statement. Then, multiple witnesses testified that they saw Steven slap Alicia. And finally, the evidence was again mentioned in the State's closing arguments. Moreover, after each witness testified about the slap, the trial court gave the following limiting instruction: "Evidence has been admitted tending to prove that the defendant committed battery against Alicia Napoleone. This evidence may be considered solely for the purpose of explaining the events leading up to the altercation on July 13, 2008."

Yet, when the trial court instructed the jury on how it was to use this evidence, it neglected to tell the jury that it was not to use the evidence about Steven allegedly slapping Alicia as proof of Steven's character or as propensity evidence. With no such limiting instruc-

tion, the jury could infer that if Steven slapped Alicia, he also provoked and illegally battered the alleged victims, an inference which K.S.A. 60-455 specifically intends to prohibit. Although we do not know how this evidence was considered by the jury, the danger was that the jury might believe that Steven's character was such that he had a propensity to engage in conduct of the sort charged. Thus, the jury might believe that Steven had acted in conformity with that character on the occasion at issue in the charged offenses. See *State v. Gunby*, 282 Kan. 39, 48-49, 144 P.3d 647 (2006) (quoting *Davis*, 213 Kan. at 58).

As many times as this evidence was presented to the jury, it is readily apparent that it was unfairly prejudicial to Steven. The record in this case clearly demonstrates that undue prejudice would have resulted from the admission of the other crimes evidence. Therefore, even if this evidence would have rendered the probable existence of a fact in issue, it would still be inadmissible because the probative value of the evidence was substantially outweighed by the prejudicial effect of the evidence.

*Harmless Error*

Because I have determined that the prior bad acts evidence should not have been admitted under K.S.A. 60-455, the next step is to determine whether the error was harmless.

The erroneous admission of K.S.A. 60-455 evidence does not automatically require reversal. "[T]he admission of K.S.A. 60-455 evidence without the explicit relevance inquiries, particularized weighing of probative value and prejudicial effect, or prophylactic limiting instruction is not inevitably so prejudicial as to require automatic reversal. On the contrary it may be harmless." *Gunby*, 282 Kan. at 57. As a result, we must now determine whether the admission of the evidence that Steven slapped Alicia was harmless under K.S.A. 60-261, which states that error in the admission of evidence is not "ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the court inconsistent with substantial justice." See *State v. Boggs*, 287 Kan. 298, 318, 197 P.3d 441 (2008).

Here, as stated earlier, the evidence that Steven slapped Alicia was continuously brought up throughout the trial. Because the charges in this case involved aggravated battery, other acts of battery were highly prejudicial to Steven. Therefore, this propensity evidence prejudiced Steven and likely affected the outcome of the trial.

The admission of evidence that Steven slapped Alicia had a real likelihood of changing the result of the trial. Thus, the trial court's error in admitting the evidence was not harmless.

*The Trial Court Erred in Instructing the Jury on the Use of Force in Defense of a Person*

The majority holds that the trial court's self-defense instruction, which omitted the no-duty-to-retreat language from this instruction, did not deny Steven a fair trial. I disagree.

During the trial, Steven requested a self-defense instruction. The proposed instruction, based on PIK Crim. 3d 54-17, reads as follows:

"Defendant claims his use of force was permitted as self-defense.

"Defendant is permitted to use force against another person when and to the extent that it appears to him and he reasonably believes such force is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.

"*When use of force is permitted as self-defense, there is no requirement to retreat.*" (Emphasis added.)

The trial court agreed to give the instruction; however, the instruction the trial court gave the jury omitted the last paragraph of the PIK instruction. The instruction the jury received failed to include the paragraph that told the jury that if it determined that Steven had acted in self-defense, Steven did not have a duty to retreat.

"An appellate court reviewing a district court's giving or failure to give a particular instruction applies a clearly erroneous standard where a party neither suggested an instruction nor objected to its omission." *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009); see K.S.A. 22-3414(3).

"An instruction is clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred." *Martinez*, 288 Kan. at 451-52.

Trial courts are not required to use PIK instructions, but it is strongly recommended. Modifications or additions to the PIK instructions should only be made if the particular facts of a case require it; however, absent such need, PIK instructions should be followed. *State v. Dixon*, 289 Kan. 46, Syl. ¶ 10, 209 P.3d 675 (2009).

Steven made no objection to the trial court's self-defense instruction. Therefore, the clearly erroneous standard applies.

Steven points out that the State argued to the jury that he did not try to walk away or try to avoid a physical confrontation with the victims, which Steven contends makes the missing language mandatory. Steven contends that without this last sentence of the instruction, the jury could have believed that Steven was required to retreat. The State responds by noting that the statement in closing was made in reference to Instruction 13.

Instruction 13 reads as follows:

"A person who initially provokes the use of force against himself is not permitted to use force to defend himself unless the person reasonably believes that he is in present danger of death or great bodily harm, and he has used every reasonable means to escape such danger other than the use of force which is likely to cause death or great bodily harm to the other person or the person has in good faith *withdrawn from physical contact with the other person and indicates clearly to the other person that he desires to withdraw and stop the use of force,* but the other person continues or resumes the use of force." (Emphasis added.)

Instruction 13 makes the missing no-duty-to-retreat language crucial because the prosecutor strongly argued that Steven had a duty to retreat before the altercation started. During cross-examination, the prosecutor asked Steven if he had run for help or had called 911:

"Q. And did you run up and knock on somebody's door?
"A. No; I did not.
"Q. And did you run to your grandma's house?
"A. No; I did not.
"Q. She lived right in that area, didn't she?

"A. We didn't get that far.

"Q. Did you pick up your cell phone and call 9-1-1 and say I'm in fear for my life?

"A. No; I did not."

The prosecutor continued to argue that Steven had a duty to retreat in closing argument. In stressing that Steven did not retreat, the prosecutor asked the jury:

"Did the defendant use other—use every reasonable means to escape such danger? The State contends that he did not. The defendant did not run. He did not call 9-1-1. He didn't run to the neighbor's house. He didn't pound on the door. He didn't get to his grandma's house. He didn't call his brother and say, come back for me, I'm—these guys are following me, I think I'm about to be killed or in danger of great.bodily harm. . . . In this case the defendant did not use every reasonable means to escape."

This type of language just quoted by the State is problematic with our Supreme Court pronouncement in *State v. Scobee,* 242 Kan. 421, 748 P.2d 862 (1988). In *Scobee,* the court held that a no-duty-to-retreat instruction should have been given in Scobee's trial because "[t]he prosecution . . . built its case around the failure of [Scobee] to retreat" when two assailants set upon him in the driveway of his home. 242 Kan. at 428. Here, the State also built its case around Steven's failure to retreat. Thus, the State argued that Steven could not rely on his self-defense theory because he should have retreated before using force.

To argue, as the majority does, that because self-defense did not apply to any of Steven's crimes of conviction, there is not a real possibility the jury would have rendered a different verdict even if the jury had been instructed that Steven had no duty to retreat under the self-defense instruction is to set up a "straw man" argument. The majority seems to use this argument as a ploy to respond to an argument of its choosing and not one that is actually presented. The majority's assertion ignores that the State had charged Steven with one count of intentional aggravated battery with great bodily harm and two counts of aggravated battery intentionally causing bodily harm with a deadly weapon. Moreover, the jury was required to determine if Steven was guilty of any of

the intentional aggravated battery charges before moving on to the lesser charges of reckless aggravated battery.

Thus, the question is not whether the jury had a need to consider self-defense with regard to Steven's two crimes of conviction. The question is whether there is a real possibility that the jury would have ruled differently had it been instructed that Steven had no duty to retreat under the self-defense instruction when it deliberated the three intentional aggravated battery charges.

Because the evidence was disputed as to who was the initial aggressor, the no-duty-to-retreat language was key to Steven's self-defense theory. There is a reasonable possibility the jury would have acquitted Steven entirely of one or more of the charges had the trial court given a no-duty-to-retreat instruction. Thus, the majority's conclusion is flawed when it says that "there was not a real possibility the jury would have rendered a different verdict if it was instructed as Steven suggests." 47 Kan. App. 2d at 715.

On the contrary, the omitted no-duty-to-retreat language from the self-defense instruction gutted Steven's self-defense theory. The only instruction that the jurors heard on the issue of retreat told them that Steven had a duty to retreat if he provoked the use of force against himself. The trial court, however, failed to tell the jury that Steven had no duty to retreat under the self-defense instruction. As the majority correctly states, jurors are presumed to follow their instructions. Therefore, this omission in the self-defense instruction might have led the jury to believe that Steven first had to retreat before he was entitled to defend himself. Even if some of the jurors believed that Steven had acted in self-defense, they might have believed that they were precluded from finding him not guilty entirely of the charges because he had failed to retreat from the altercation. Consequently, Steven did not receive a fair trial when the no-duty-to-retreat language was omitted from the self-defense instruction; this omitted language was central to his self-defense theory.

There is a real possibility that the jury would have ruled a different way had it been properly instructed. I would reverse the convictions and remand for a new trial.